Berlin Griffin, et al. [1] v. Commissioner. Griffin v. Commissioner
Docket Nos. 53253, 54098, 54127.
United States Tax Court
T.C. Memo 1958-210; 1958 Tax Ct. Memo LEXIS 12; 17 T.C.M. (CCH) 1042; T.C.M. (RIA) 58210; December 15, 1958
*12 Held, that an amount of $85,000 received by a partnership in 1943 constituted a deposit and not taxable income of the partnership in that year as selling price of whiskey. The portion of such deposit retained in 1944 as liquidated damages constituted income of the partnership in 1944. The determination of the respondent that the petitioner Berlin Griffin was in receipt of unreported income in the years 1943 and 1944 in the respective amounts of $185,752.88 and $90,000 representing amounts received in excess of OPA ceiling prices upon sale of whiskey, approved. Held, further, that some part of the deficiency of the petitioner Berlin Griffin for each of the years 1943 and 1944 was due to fraud with intent to evade tax. Section 293(b), Internal Revenue Code of 1939. Benjamin Alpert, Esq., 810 Board Street, Newark, N. J., and John E. Mahoney, Esq., for the petitioners. W. Preston White, Esq., and Robert O. Rogers, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of the petitioner Berlin Griffin for the calendar years 1943 to 1947, inclusive, and additions to tax as *13 follows: Additions to the Tax
Year
Deficiency
Sec. 293(b)
Sec. 293(a)
1943
$191,278.58
$95,639.29
1944
53,751.83
26,875.92
1945
2,504.89
$125.24
1946
8,951.91
447.60
1947
4,558.87
227.94
The respondent determined deficiencies in income tax of the petitioners, George K. Yetter and H. Halpine Smith, for the calendar years 1943 and 1945, as follows: George K.
H. Halpine
Year
Yetter
Smith
1943
$17,589.87
$18,708.52
1945
15,933.37
6,048.86
As a result of stipulations entered into between the parties, the only taxable years remaining in controversy are 1943 and 1944 with respect to the petitioner Berlin Griffin and 1943 with respect to the petitioners, George K. Yetter and H. Halpine Smith. The issues as to the years remaining in controversy are primarily factual. The issues with respect to the petitioner Berlin Griffin are whether he received in the years 1943 and 1944 unreported amounts of $185,782.88 and $90,000, respectively, upon sales of whiskey in excess of maximum OPA prices, and whether as a result of failure to include such amounts in his returns some part of the deficiency for each year was *14 due to fraud with intent to evade tax. Respondent affirmatively claims, in the alternative, increased deficiencies against the petitioners, Yetter and Smith, for the year 1943 in the event this Court should hold that the amount of $185,782.88 is taxable to the three petitioners instead of to the petitioner Berlin Griffin alone. Also involved is the question whether an $85,000 "deposit" on a whiskey agreement received by a partnership, Palm Beach Distributors (in which the petitioners were equal partners) is properly includible in the taxable period ended December 31, 1943, instead of the taxable period ended April 23, 1944, as reported by the partnership, and if so, whether for such latter period the partnership is entitled to a deduction of a $10,000 "refund" in connection with such "deposit." Findings of Fact Some of the facts were stipulated and the stipulations are incorporated herein by this reference. The income tax returns of each of the petitioners for each year in question were filed with the collector of internal revenue for the district of Florida. The petitioners were associated in a number of business enterprises in Florida. They each owned stock in a corporation, *15 Palm Beach Liquors, Inc., which engaged in the operation of retail liquor establishments. They also owned another corporation, Berlin Griffin, Inc., which operated retail liquor stores. In addition, they were engaged in the construction business and sundry other business ventures. Yetter and Smith confined their activities primarily to the construction business and Griffin managed the principal activities of the whiskey business. During the years 1943 and 1944 there was a severe shortage in the supply of whiskey, making it difficult to obtain adequate allocation from the suppliers. Scotch whiskey was much scarcer than bourbon whiskey. On April 7, 1943, the petitioner Griffin and Ben B. Yoffee entered into an agreement with the stockholders of Wathen Bros., Distillers, to purchase the stock of such corporation for $620,000. Thereafter the purchase price was reduced to $614,019.15. This purchase price was paid one-half by the petitioners, Griffin, Smith and Yetter, sometimes known as the Palm Beach group, and one-half by Ben B. Yoffee, Harry L. Baker and Ben Stein, sometimes known as the Jacksonville group, and the stock, with a minor exception, was distributed equally among these *16 six individuals. At the time of purchase of the stock the corporation owned 4,896 barrels of bourbon whiskey, and the individuals calculated that this could be bottled into at least 80,000 cases. Such number of cases, if sold by the distillery at the OPA ceiling price, would yield a loss. However, the individuals contemplated selling the bottled whiskey as wholesalers and obtaining a 15 per cent OPA markup, which would result in a net profit of approximately $250,000. The corporation did bottle the 4,896 barrels, which yielded 82,942 cases. In addition, the corporation bottled 6,500 barrels of whiskey, known as the Kidel whiskey, which the corporation did not own. On August 14, 1943, the corporation was dissolved and was succeeded by a partnership composed of these same six individuals operating under the same name, Wathen Bros., Distillers. The partnership proceeded to sell the bottled whiskey during the period of its operations from August 15 to December 29, 1943, when the Jacksonville group bought out the Palm Beach group's interest in the partnership, paying therefor $186,561.57. The total number of cases shipped by the partnership over that period was 173,742 cases. This *17 included the Kidel whiskey. On September 1, 1943, the three petitioners formed a partnership known as Palm Beach Distributors in which each owned an equal interest. That partnership continued until April 23, 1944, when Griffin sold out his interest to the other two partners for $72,564.04. This partnership engaged in the wholesale liquor business and filed its partnership returns for the taxable year 1943 and the taxable period January 1 to April 23, 1944, with the collector of internal revenue for the district of Florida. Included in the whiskey shipments made by the partnership, Wathen Bros., Distillers, from August 15, 1943 to December 29, 1943, there were 38,955 cases shipped directly to Palm Beach Distributors and 10,060 cases shipped directly to customers of Palm Beach Distributors, for which Palm Beach Distributors was billed $1,114,979.56 by Wathen Bros., Distillers. The books and records of Palm Beach Distributors reflect the purchase and sale of this whiskey, and the profit calculated at OPA ceiling price was reflected in its returns. In addition to this there were other shipments totaling at least 40,000 cases made by Wathen Bros., Distillers to customers of Berlin Griffin *18 or of the enterprises owned by the three petitioners, which were billed by the partnership, Wathen Bros., Distillers, directly to such customers, in the amount of at least $900,000. Altogether over this period there were, therefore, at least 90,000 cases of Wathen Bros., Distillers whiskey at the disposition of Berlin Griffin. The Britt Transaction Colin L. Britt and Ed Smith were associated with Richland Wholesale Liquors, Inc., which was located in Columbia, South Carolina. Griffin was introduced to Britt in New York by Thomas Gorman at some time prior to September 23, 1943. Britt told Griffin that he could offer substantial quantities of Scotch whiskey in return for bourbon whiskey from Griffin, and they agreed to sell whiskey to each other. On September 23, 1943, Griffin visited Britt at a hotel in Columbia, South Carolina, in order to reduce their agreement to writing. Griffin had already had shipments of liquor made to Richland Wholesale Liquors, Inc., but had received no shipments from Britt. Britt was about to be inducted into the army and Griffin wanted the agreement in writing in order that it would be honored by Smith. Britt gave Griffin $85,000 and Griffin wrote *19 and signed a receipt therefor, dated September 23, 1943, on the hotel stationery. The receipt was as follows: "Received from C. L. Britt "Eighty five Thousand Dollars to hold as deposit against the following liquors he will obtain for me against Bourbon Whiskey I will obtain for him, he will obtain the following liquors 5000 cases Ushers Scotch, 2000 cases White Horse Scotch, 200 cases Watsons Scotch "This money will be returned to C. L. Britt when this merchandise is received by me - ("signed) Berlin Griffin "This is my understanding (signed) C. L. Britt" Between September 13 and November 10, 1943, Wathen Bros., Distillers, made directly to Richland Wholesale Liquors, Inc. 10 shipments of bourbon whiskey aggregating 13,873 cases for which Richland was billed directly by Wathen Bros. an amount of $321,880.23. In addition, from about October 18 to November 17, 1943, Wathen Bros. (but in one instance Palm Beach Distributors) shipped to Richland Wholesale Liquors, Inc. 5 shipments of bourbon whiskey aggregating 7,958 cases, for which Richland was billed by Palm Beach Distributors in the amount of $200,295.04, which included a 10 per cent markup over the amount Palm Beach *20 Distributors was billed by Wathen Bros. for the whiskey. Britt was inducted into the army in the early part of 1944. He had carried out only in part his commitment to deliver whiskey to Griffin. On April 18, 1944, Griffin visited Britt at a hotel in Fayetteville, North Carolina, at which time the following document was executed. "To Berlin Griffin "This will confirm the nature of our transaction on or about Sept. 28, 1943. I gave you 85000, Eighty Five Thousand Dollars to be used as a Deposit against delivery by me to you of the Following Merchandise: 5000 Cases of Ushers Scotch, 5000 Cases of Domestic Wine, 1000 Cases of White Horse Scotch, 200 Cases of King James Scotch "Against the above I have obtained for you 500 cases Ushers Scotch and 2000 cases of wine - up to date you have shipped practically all the Bourbon which we agreed on. "It was our agreement that you would return to me the deposit which I made you as soon as I had obtained the whiskies for you. "I feel under the existing circumstances that I have given the facts as they were - "Due to the fact that I am in the army at the present time I won't be able to deliver my committment and some adjustment will *21 have to be made on the Deposit I Paid You - "(signed) C. L. Britt "This is my understanding, (signed) Berlin Griffin" At the time the petitioner Griffin sold his interest in the partnership, Palm Beach Distributors, the contractual arrangements with Britt had not been concluded. Accordingly, the three partners entered into an agreement, dated April 25, 1944, in which it is recited that Griffin was holding a deposit of $85,000 from Britt, and which provided that if the agreed amount of liquor should be delivered by Britt before December 1, 1944, the profit on sale thereof would be divided among the three equally, but that if the liquor should not be delivered before December 1, 1944, the deposit should be divided equally among the three. On November 24, 1944, Britt visited Griffin in the latter's business office in Palm Beach, Florida, and a settlement was reached, concurred in by each of the petitioners, as a result of which $10,000 was returned to Britt and the remaining $75,000 was divided equally among the three petitioners. In arriving at such settlement with Britt it was calculated that the $75,000 retained would have been the profit which the partnership would have made *22 on all the whiskey had it been delivered as agreed. On November 24, 1944, Britt signed a receipt for the $10,000 received and released any claim he had to the remaining $75,000, stating that it was being retained as damages for his failure to deliver whiskey as agreed. In its return for the fiscal period ended April 23, 1944, the partnership, Palm Beach Distributors, reported as income the amount of $75,000 with the explanation Britt to furnish certain merchandise. He defaulted on his agreement, and same has been retained as damages - $75,000.00." Each of the three petitioners in his return for the year 1944 included $25,000 of this amount as income. The respondent determined that the $5,000 received in 1943 constituted overceiling payments for whiskey sold to Britt and that it constituted income to the partnership in the year 1943. He therefore increased the reported income of each of the petitioners for the year 1943 by one-third of that amount. He eliminated from reported income of the partnership for the year 1944 the amount of $75,000 and in effect held that the partnership was not entitled to a deduction for the year 1944 on account of the return of $10,000 to Britt. *23 The amount of $85,000 received by Berlin Griffin from Britt in 1943 did not constitute an overceiling payment received by Griffin or the partnership, Palm Beach Distributors, from the sale of liquor. It constituted a deposit to guarantee sale and delivery of whiskey by Britt in accordance with his agreement with petitioner Griffin. Griffin was acting on behalf of the partnership, Palm Beach Distributors. The transaction with Britt was concluded in 1944 by agreement between Britt and Griffin under which Griffin retained $75,000 as liquidated damages for Britt's failure to perform his part of the contract. In entering into this latter agreement, the petitioner Griffin was acting on behalf of himself and the petitioners, Smith and Yetter, all as parties of equal interest. The McDonough Transaction Pat McDonough owned the Vidalia Distributing Co. in Vidalia, Louisiana, which was engaged in the wholesale liquor business. The bulk of his sales was to Mississippi bootleggers. James J. Frawley, regional manager of Schenley Distillers, Three Feathers Brand, for a southern territory which included the State of Florida, learned from Ben Stein, one of the partners in the partnership, Wathen *24 Bros., Distillers, of the availability of certain whiskey and Stein advised Frawley that a commission of 50 cents per case would be paid if a buyer could be located. Frawley in turn advised McDonough as to this available source of whiskey and McDonough indicated his interest. Thereupon Frawley told Stein of McDonough's interest and thereafter the petitioner Griffin called Frawley about the matter. Thereafter McDonough and petitioner Griffin arranged by telephone for a meeting at a hotel in New York City. Such a meeting was held at some time prior to November 15, 1943, at which time Griffin agreed to sell and McDonough agreed to buy specific quantities of specified brands of whiskey. McDonough took with him to the meeting about $40,000 in cash and agreed to pay and did, in fact, pay to Griffin an aggregate amount of cash in excess of OPA ceiling prices upon the whiskey as follows: Over ceil-
Over-
Number
ing Price
ceiling
of Cases
Bottle Size
per Case
Amount
234
Fifths
$ 9.00
$ 2,106.00
1,113
Pints & 1/2 pints
11.00
12,243.00
1,653
Pints
13.00
21,489.00
3,000
$35,838.00
Later McDonough agreed to accept 500 more cases of quarts *25 and agreed to pay an overceiling price of $11 per case, totaling $5,500. Shipments were made to the Vidalia Distributing Co. by Palm Beach Distributors, of all the whiskey agreed upon, including the additional 500 cases of quarts, and billings were rendered at the OPA price under date of November 15, 1943, for a total amount of $92,835.04 for the 3,500 cases for which sight drafts were accepted and paid. In a subsequent telephone conversation between McDonough and Griffin, McDonough arranged to purchase additional quantities of whiskey at overceiling prices of $11 for fifths and $13 for pints. McDonough made an advance payment on this order by check dated November 18, 1943, drawn by Vidalia Distributing Co. in favor of Wathen Bros., Distillers in the amount of $50,000. The unpaid balance of the billing price was paid by check dated December 8, 1943, in the amount of $14,404. Shipments were made on December 8 and December 11, 1943 and were billed by Wathen Bros., Distillers under dates of December 10 and December 15, 1943, at OPA prices in the total amount of $64,404. Frawley met the petitioner Berlin Griffin in the latter part of 1943 at a hotel in Atlanta, Georgia. Griffin telephoned *26 him and asked him to see him at the hotel. Petitioner told Frawley that Pat McDonough owed him, Griffin, some money and asked Frawley to arrange to obtain this money from McDonough and bring it to Florida on his next trip to Florida. At that time Griffin told Frawley that if he obtained this money for him, he could take his commission out of the money. Thereafter Frawley met McDonough at a hotel in Jackson, Mississippi at some time within 30 days after the last shipment above referred to, and McDonough turned over to him $42,100 in cash for delivery to Griffin. This amount included the overceiling payment on account of the 500 additional cases of quarts which had been delivered in the first shipment to Vidalia Distributing Co. Thus the amount of $42,100 was made up of overceiling payments as follows: Overceil-
Over-
Number
ing Price
ceiling
of Cases
Bottle Size
Per Case
Amount
1,200
Fifths
$11.00
$13,200.00
1,800
Pints
13.00
23,400.00
3,000
$36,600.00
500
Additional cases of quarts
on initial transaction at $11 per case
5,500.00
3,500
$42,100.00
Frawley returned to Atlanta and the next morning he telephoned the petitioner *27 Griffin in West Palm Beach and told him he had received the money from McDonough and that he, Frawley would be in Miami on a specified date arriving at a specified time on a plane and told him the name of the hotel at which he would stay. He left Atlanta for Florida a day or two after that. After arriving at his hotel in Miami, Frawley received a telephone call from the petitioner Griffin in West Palm Beach and was told that someone would come over from West Palm Beach and pick up the money. Thereafter a man representing himself as being from petitioner Griffin called upon Frawley at his hotel and stated that he had come to pick up "the package." Thereupon Frawley turned over to this person a package containing $38,850, Frawley having withdrawn from the package $3,250 as his commission of 50 cents per case on 6,500 cases. This payment was effected in 1943. Thereafter McDonough and Griffin met only once more. That was in a hotel in New Orleans at some time in 1944. During the war years McDonough engaged in many other substantial transactions in which he paid prices for whiskey in excess of OPA ceiling prices, and he also sold whiskey for amounts in excess of OPA ceiling prices. *28 Prior to 1946 he was indicted for OPA violations in selling whiskey in excess of ceiling prices. He pleaded guilty and was fined $58,000. After he was fined for the OPA violations he was subjected to income tax examination for about six weeks. He kept records in which he recorded over-ceiling payments and receipts and reported them in his income tax returns. The Best Transaction In 1943 and 1944 R. W. Best owned and operated the Richmond Wholesale Liquor Co., in Augusta, Georgia. Because of the scarcity of whiskey and the consequent inadequate allotments which the company received from distilleries, Best sought to obtain whiskey by paying prices therefor in excess of OPA ceiling prices. Thomas Gorman, the eastern representative of Browne Vintners, had on occasion arranged for Best to make purchases of whiskey at overceiling prices. Sometime between July and September 1943, Best went to New York seeking additional whiskey. He met Gorman at a hotel in New York where Gorman introduced him to Berlin Griffin. Griffin produced a list of whiskeys of different ages which he offered to sell. At that meeting with Griffin, Best agreed to buy about 4,300 cases of whiskey and to pay $11 a case *29 over the OPA ceiling price, such overceiling payment to be made after he had disposed of the whiskey. Wathen Bros., Distillers shipped directly to Richmond Wholesale Liquor Co., 1,999 10/12 cases of whiskey on October 22, 1943, for which Palm Beach Distributors billed Richmond Wholesale Liquor Co., on October 14, 1943, in the amount of the OPA ceiling price of $48,477. Wathen Bros., Distillers in turn billed Palm Beach Distributors on October 25, 1943, in the amount of $44,066.90 for this whiskey. On November 20 and November 22, 1943, Wathen Bros., Distillers shipped directly to Richmond Wholesale Liquor Co., 2,317 21/24 cases of whiskey for which Wathen Bros., Distillers billed Richmond Wholesale, on November 23, 1943, at an OPA ceiling price of $54,231.67. In each instance Richmond Wholesale Liquor Co. made payment by check. Best resold this whiskey within a few days after receipt thereof, and accepted from some retailers overceiling prices of $12 and $15 per case. He then, by telephone, made an appointment with Griffin, about the end of November, to meet him at Gorman's suite in his New York hotel in order to pay Griffin the overceiling price. Griffin did not keep the appointment, *30 and Best gave the money to Gorman to deliver to Griffin. This amounted to $47,487, at $11 per case. In a later telephone conversation he advised Griffin that he had given Gorman the money for the whiskey and Griffin stated that that was all right. After this initial transaction, Best arranged with Griffin for the purchase of 10,000 additional cases at a price of $12 per case above the OPA ceiling price. Richmond Wholesale Liquor Co. made advance payments of $225,000 toward the OPA ceiling price by checks issued to Wathen Bros., Distillers between November 15 and December 15, 1943. Shipments were made on December 8, 9, 10, 11, 13 and 14, 1943, totaling 10,000 cases at a total billing at OPA ceiling prices of $212,394.03. Proper adjustment was made by a refund to Richmond Wholesale Liquor Co. of a part of the advance payment which it had made. In December 1943, Gorman was in Augusta, Georgia, and Best asked him if he would see Griffin in Florida. Upon learning that Gorman would see Griffin, Best gave him $30,000 with instructions to deliver it to Griffin toward payment of a total overceiling price which he owed in the amount of $120,000. Best telephoned Griffin and told him that *31 he would send him $30,000 by Gorman, and Griffin approved the arrangement. In early January 1944, Griffin and Gorman, who were traveling by train to New York together, stopped off at Jacksonville where they met Best. The three then drove to Augusta where Gorman and Griffin shared a hotel room together. The next morning Best took $90,000 in cash to this hotel room and paid it to Griffin as the balance of the overceiling payment due Griffin. Best was convicted of selling whiskey in excess of OPA ceiling prices on his plea of nolo contendere. He was fined $10,000 and sentenced to two years in jail, serving eight months before he was paroled. The Burg Transaction In 1943 H. R. Burg was engaged in the wholesale whiskey business through Columbia Liquor Distributors, Inc., in Columbia, South Carolina. Ben Stein, who had been acquainted with Burg for about 20 years, informed Burg that the petitioner Griffin had whiskey for sale. At a time not disclosed by the record, Griffin went to Columbia, South Carolina, and agreed to sell Burg some whiskey. Burg placed an order with Griffin and received the whiskey. He agreed to pay Griffin $7.50 per case over the OPA ceiling price. Wathen *32 Bros., Distillers shipped to Columbia Liquor Distributors, Inc., a total of 10,121 11/12 cases of whiskey for which it billed Columbia Liquor Distributors, Inc., OPA ceiling prices in an aggregate amount of $218,184.84 over the period from September 1 to September 23, 1943. Burg did not pay any money to Griffin, but on an undisclosed date he gave Ben Yoffee an undisclosed amount of money with the understanding that he would take it to Berlin Griffin. Prior to the meeting between Burg and the petitioner Griffin, Burg had received some whiskey from Wathen Bros., Distillers for clearance to retailers on behalf of Ben Stein, which liquor was billed to Columbia Liquor Distributors, Inc. Neither the partnership Palm Beach Distributors nor any of the petitioners included in taxable income in their returns any amounts as overceiling payments received from McDonough, Best or Burg. In the notice of deficiency which respondent sent to the petitioner Griffin, the respondent increased his reported taxable income for the years 1943 and 1944 by the respective amounts of $185,782.88 and $90,000, with the following statement: "It is determined that you received an aggregate of $185,782.88 *33 in excess of ceiling prices for whiskey sold in 1943 and that no part of these over-ceiling receipts was reported in your 1943 income. * * *
"It is determined that you received an aggregate of $90,000.00 in excess of ceiling prices for whiskey sold in 1944 and that no part of these over-ceiling receipts was reported as income in your 1944 return." By amended answer the respondent affirmatively claimed, in the alternative, increased deficiencies for 1943 against the petitioners Yetter and Smith, in the event this Court should determine that one-third of the amount of $185,782.88 is taxable to each of those petitioners. About March 1943, the petitioner Griffin, acting on behalf of his corporation, Palm Beach Liquors, Inc., negotiated with one Sam Friedman for the purchase of 640 barrels of bourbon whiskey at a price which would include a payment of $100 per barrel in excess of OPA ceiling prices. Thereafter an overceiling payment price was paid by Griffin to Friedman in the amount of $63,700 in cash, which was contributed by the three petitioners herein who were stockholders of the corporation. Later, in view of an investigation being undertaken by the Alcohol Tax Unit, Griffin *34 sought to return some of the whiskey to Friedman. As a result, a portion of the whiskey was purchased by one Olivo at an overceiling payment of $26,000 in cash, which amount was retained by the petitioner Griffin and other stockholders of the corporation. A criminal information was filed on October 24, 1944, in the United States District Court for the Western District of Kentucky against Berlin Griffin and others for OPA violations in selling and delivering 582 barrels of whiskey at overceiling prices to Olivo and others. Griffin pleaded guilty on the same date and was convicted and fined $26,125. On June 4, 1946, the petitioner Griffin was indicted in the United States District Court for the Western District of Kentucky, on 58 counts of violation in 1943 of the Emergency Price Control Act of 1942, in selling and delivering whiskey at overceiling prices to Robert W. Best, Colin L. Britt, and Pat McDonough during the year 1943. He pleaded nolo contendere, was convicted on January 3, 1947, and paid fines totaling $153,700. The petitioner Griffin and Ben Stein were indicted in the United States District Court for the Western District of Kentucky for an OPA violation in connection *35 with the sale of whiskey to H. R. Burg. They pleaded nolo contendere, were convicted, and were fined. In 1943 the petitioner Griffin received overceiling payments from McDonough in the amount of $74,688 and from Best in the amount of $77,487, a total of $152,175. In 1944 he received an overceiling payment of $90,000 from Best. These overceiling payments and any overceiling payments which he may have received from Burg, constituted taxable income to him. Some part of the deficiency in income tax of the petitioner Berlin Griffin for each of the years 1943 and 1944 was due to fraud with intent to evade tax. Opinion The respondent, in determining deficiencies against the three petitioners for the year 1943, held that the amount of $85,000 received by petitioner Berlin Griffin from Colin L. Britt in 1943 constituted overceiling price for whiskey sold by the partnership, Palm Beach Distributors, to Britt in that year. The petitioners, on the other hand, contend that this amount was received as a deposit to guarantee sale and delivery of whiskey by Britt to Griffin, who was acting on behalf of the partnership. The question is essentially one of fact. Upon the evidence of record we *36 have concluded and found as a fact that the $85,000 was not received as a payment for whiskey, but constituted a deposit to guarantee performance by Britt of his undestaking to furnish liquor to the partnership. It retained its character as such until 1944 when, by agreement, the partnership became entitled to $75,000 thereof as liquidated damages. It is well settled that an amount received as a deposit to secure performance of a contract is not taxable income when received. John Mantell, 17 T.C. 1143, and cases cited therein. We hold that the partnership was not in receipt of income from the Britt transaction in 1943 and that the respondent erred in holding that the $85,000 constituted income of the partnership in that year. The petitioner Griffin properly included in his return for 1944 one-third of $75,000 from this transaction, when that amount was by agreement retained as liquidated damages. In his notice of deficiency addressed to the petitioner Griffin, the respondent held that Griffin had received overceiling payments for whiskey in the years 1943 and 1944 in the respective amounts of $185,782.88 and $90,000, which had not been included in taxable income. He *37 therefore increased reported income by those amounts and held that some part of the deficiency for each of those years was due to fraud with intent to evade tax. At the hearing both parties presented witnesses and adduced proof with regard to three transactions, namely, those with Pat McDonough, R. W. Best, and H. R. Burg. The petitioners do not deny that whiskeys in the amounts found in our Findings of Fact were sold to those individuals at the ceiling prices which we have found. All the whiskey was from the whiskey bottled by the partnership, Wathen Bros., Distillers. Sometimes the shipment was made and billed to the partnership, Palm Beach Distributors, in which each of the petitioners owned a one-third interest, and was then sold and rebilled by Palm Beach Distributors, sometimes it was shipped and billed directly to the customer by Wathen Bros., and sometimes it was shipped by Wathen Bros., directly to the customer and billed to Palm Beach Distributors, which in turn billed the customers at a markup. However, there seems to be no question that all this whiskey, with the possible exception of that shipped to Burg, which will be discussed hereinafter, was at the disposition of *38 the petitioner Griffin, either on his own behalf or on behalf of the partnership, Palm Beach Distributors. The parties are in sharp disagreement, however, as to whether Griffin received any payments for the whiskey in excess of the OPA ceiling prices. Griffin testified flatly that he did not receive any overceiling payments in any of the transactions in question herein. The petitioner Yetter testified that he was confident that Griffin did not receive any overceiling payments and that he himself received no part of any overceiling payments. The petitioner Smith testified that he knew of only one overceiling payment that any of the three petitioners received, namely, the $26,000 received upon the disposition of certain whiskey which had been obtained from one Friedman, which transaction is not in question here. Griffin testified that he was willing to furnish whiskey to McDonough and his company, Vidalia Distributing Co., upon the promise of James J. Frawley that he would obtain increased allotments for Griffin and his interests of a certain brand of whiskey. He also testified that he furnished whiskey to Best because Gorman agreed to obtain different brands of whiskey for him, Griffin. *39 On the other hand, both Best and McDonough testified to agreements with Griffin to pay specified amounts per case as overceiling payments, as set forth in our Findings of Fact. McDonough testified that he paid directly to the petitioner in 1943 an amount of $35,838 as overceiling payments. He also testified that he gave $42,100 in cash to James J. Frawley to give to the petitioner. Frawley testified that after making telephone arrangements with Griffin he delivered the money, less, however, $3,250 as commission, to a representative of petitioner. Best testified that in one transaction with Griffin, he agreed to pay Griffin $11 per case overceiling for whiskey to be delivered. That transaction involved 4,317 and a fraction cases, which would amount to an overceiling payment of $47,487. Best also testified to having arranged a meeting with Griffin, which we have concluded from the record was about the end of November 1943, to pay this overceiling price, but that when Griffin did not attend the meeting he paid it over to Thomas Gorman for delivery to the petitioner. He testified that he telephoned Griffin and told him about this and that Griffin approved. He also testified to a second *40 order of 10,000 cases as to which he agreed with Griffin to pay $12 per case overceiling. He stated that he gave $30,000 to Gorman in December 1943 to deliver to Griffin as part payment of the $120,000 overceiling payment on this shipment. As to this delivery of money he stated that he also telephoned Griffin and received approval as to this method of payment. Gorman was not called as a witness. Best further testified that he personally delivered the remaining $90,000 of the overceiling price to Griffin in January 1944, at a hotel in Augusta, Georgia. Griffin agrees that such a meeting was held in a hotel in Augusta and that Best did bring a package of money, but denies knowing how much money there was and states that Gorman, rather than he, received it. The petitioners attack the credibility of McDonough and Best because of their convictions for violations of the Emergency Price Control Act of 1942 in selling whiskey in excess of OPA ceiling prices, and further contend that they should be disbelieved because of bias in that it was to their interest from an income tax standpoint to obtain increased costs of goods sold by alleging that they made these overceiling payments. However, *41 the petitioner Griffin also had been convicted of OPA violations and indeed it appears from the record here that it was not uncommon for either the petitioner Griffin or McDonough and Best to receive and pay overceiling prices for whiskey. The petitioners also contend that McDonough was not truthful in stating that at a meeting held in a hotel in New York he calculated the overceiling price based upon a specific number of cases and paid the resulting amount of $35,838 at that time, since no one could have known how many cases or what types of bottles were available at that time. Griffin testified that he himself could not have known how many cases of each type of bottle size there would be. He also testified that at the first meeting with McDonough, he agreed to furnish more whiskey "as we bottled up more whiskey." We can give no credence to this testimony of Griffin because the evidence shows that practically all the Wathen Bros., Distillers whiskey was bottled prior to the dissolution of the corporation on August 14, 1943. Actually the initial order to McDonough was filled from shipments of bottled whiskey made by Wathen Bros., Distillers to Palm Beach Distributors on September *42 10 and September 15, 1943, as clearly shown by the serial numbers. The witnesses, McDonough, Best, and Frawley, testified clearly, unequivocally, and without hesitation. Having observed their demeanor on the witness stand and having analyzed their testimony, we believe that they were testifying truthfully. From a consideration of their testimony and the record as a whole, we have concluded and have found as a fact, contrary to the testimony of the petitioner Griffin, that Griffin did receive overceiling payments in the aggregate amounts of $152,175 in 1943 and $90,000 in 1944. The evidence shows that Wathen Bros., Distillers shipped over 10,000 cases of whiskey to H. R. Burg's company, Columbia Liquor Distributors, Inc., in 1943. Burg testified that he had ordered whiskey from Griffin and had agreed to pay $7.50 per case over the OPA ceiling price. It also appears that Burg had had some dealings with Ben Stein, and from the record we are unable to make a finding as to what portion of the whiskey above referred to was shipped on Griffin's account. It may well be that some of it was on account of Stein. Both Stein and Griffin were indicted and convicted for selling whiskey to Burg *43 at prices in excess of OPA ceilings. We have no direct evidence as to any overceiling payments by Burg to Griffin, although Burg testified that he did pay some undisclosed amount to Ben Yoffee, an associate of Stein, for delivery to Griffin. He testified, however, that he did not know whether Griffin actually received that amount. Under these circumstances, we have been unable to find what amount, if any, Burg may have paid to Griffin as overceiling prices. The respondent relies heavily upon the presumption in favor of the correctness of his determination that Griffin received total overceiling payments in 1943 of $185,782.88. As stated above, we are satisfied, and have found as a fact, that Griffin did receive total overceiling payments in 1943 aggregating $152,175. If all the whiskey which was shipped by Wathen Bros., Distillers to Burg or his company, Columbia Liquor Distributors, Inc., was indeed shipped on behalf of Griffin and an overceiling payment of $7.50 was paid, Griffin would have received from this source, as overceiling prices, an amount of about $75,000. While, as stated above, we are unable to conclude as a fact that Griffin did receive this amount or any portion *44 thereof, he has not shown that he did not receive such amount or a portion thereof. In this state of the record we are constrained to approve the determination of the respondent that the petitioner Griffin did receive total overceiling payments in the amounts of $185,782.88 and $90,000 in the years 1943 and 1944, respectively. At the trial of this case counsel for the respondent offered in evidence the record of the indictment and conviction, upon a plea of nolo contendere, of the petitioner Berlin Griffin in the District Court of the United States, Western District of Kentucky, on charges of violation of the Emergency Price Control Act of 1942 in selling and delivering whiskey at overceiling prices to Robert W. Best, Colin L. Britt, and Pat McDonough during the year 1943. This was received in evidence as bearing upon the credibility of the petitioner Griffin. See Lillian Kilpatrick, 22 T.C. 446, affirmed (C.A. 5), 227 Fed. (2d) 240, and cases cited therein, and Paul Masters, 25 T.C. 1093, affirmed (C.A. 3), 243 Fed. (2d) 335. However, counsel for the petitioners objected to the receipt of this exhibit for purposes other than *45 impeachment. This objection was not ruled upon at the time of the trial, and we find it unnecessary to pass upon such objection at this time. The testimony and other evidence of record clearly establish the facts which we have found regarding the receipt of overceiling payments by the petitioner Griffin from McDonough and Best, and in reaching our conclusion in that respect we have given no weight to this conviction. It may be added that with regard to the Britt transaction, discussed first above in this Opinion, even if this conviction were admitted for any probative value in determining whether the $85,000 was received by the petitioner Griffin from Britt as an overceiling payment, we would still conclude, upon the basis of the testimony and the documentary evidence, that the weight of the evidence establishes that the $85,000 was not an overceiling payment, but was a deposit. On brief the petitioners alternatively argue that if one of the partners of either the partnership Wathen Bros., Distillers or Palm Beach Distributors received side money from the sale of whiskey belonging to the partnerships, such money constitutes partnership income, upon which each partner is taxable according *46 to his partnership interest, whether or not distributed and whether or not the other partners were even aware of such overceiling receipts. The respondent has determined that the overceiling payments belonged to the petitioner Griffin and makes no contenton that such receipts were partnership income, or that either of the other petitioners is taxable on any part of such payments. Only alternatively does he seek an increase in the deficiency against the petitioners. Yetter and Smith, if it should be held that the overceiling payments were income of the three petitioners rather than of Griffin alone. It is true that the whiskey was owned in the first instance by the partnership, Wathen Bros., Distillers, in which each of the petitioners owned a one-sixth interest. There can be no doubt that each owned a share in the profit upon the sale of the whiskey by that partnership, which was at OPA ceiling prices. That partnership was composed of two groups, the Palm Beach group, consisting of the three petitioners, who in due course associated themselves together in the partnership, Palm Beach Distributors, and the Jacksonville group, composed of Stein, Yoffee, and Baker. About one-half of *47 the Wathen Bros., Distillers whiskey was made available for sales to customers of Griffin or the partnership, Palm Beach Distributors. Some of this whiskey was received by Palm Beach Distributors and was in turn sold at an additional wholesale markup. As to any profit made by the Palm Beach Distributors resulting from the markup, there can be no question that each of the petitioners was taxable upon his distributive share. However, no overceiling amounts were billed by either of the partnerships. No overceiling receipts were included in the returns of either the partnerships or the petitioners. All the evidence, including the testimony of the purchasers of the whiskey, was to the effect that agreements were made with Griffin to pay him overceiling amounts. There is no evidence whatever to the effect that anyone else received any overceiling payments either directly or through Griffin. Indeed, the petitioner Yetter testified specifically that he had received no overceiling payments, although he had paid a share of the fines and legal expenses incurred by Griffin. The petitioner Smith testified that he had no knowledge of any overceiling payments except one which is not involved here. *48 Under the circumstances, we certainly cannot find as a fact that either petitioner Yetter or petitioner Smith received any overceiling payments. The petitioners rely upon section 182 of the Internal Revenue Code of 1939, which provides that in computing the net income of each partner, he shall include, whether or not distribution is made to him, his distributive share of the ordinary net income of the partnership. This reliance presupposes that it is established that any overceiling receipts by Griffin constituted partnership income. As stated, the partnership returns of Palm Beach Distributors do not include any overceiling receipts. None of the partners included any overceiling receipts in their returns, and Smith and Yetter deny having received any such overceiling payments. While there seems to be no question raised here as to the fact that each petitioner owned a one-third interest in Palm Beach Distributors, we do not know the terms of that partnership agreement. Indeed, we do not know whether such agreement was oral or written. While, as stated previously, the ownership of a one-third interest by each petitioner would entitle him to one-third of any legitimate partnership *49 income, we do not think it necessarily follows that each partner would be entitled to a one-third interest in any illegal receipts by one of the partners. We know that the petitioner Griffin was the only partner who was active in the conduct of the whiskey business and for all that appears here the other petitioners may have been satisfied with receiving their share of the legitimate profit derived upon the sale of the whiskey. If in fact they knew of any overceiling receipts by Berlin Griffin, they may have acquiesced in his retention thereof. The case of Stoumen v. Commissioner (C.A. 3), 208 Fed. (2d) 903, affirming a Memorandum Opinion of this Court [12 TCM 267], relied upon by the petitioners, is not determinative here. There, it was found that one of the partners was acting on behalf of the partnership in receiving the selling price of partnership property and since some of the selling price was applied to the benefit of the partners or the partnership it was concluded that the income was that of the partnership. That case involved no receipt by a partner of illegal payments. The facts in Bell v. Commissioner (C.A. 5), 219 Fed. (2d) 442, *50 also cited by the petitioners, are not comparable to those in the instant case. We cannot conclude, as urged by the petitioners, that the overceiling amounts received by the petitioner Berlin Griffin constituted income of either of the partnerships. The respondent has determined 50 per cent additions to the tax, pursuant to section 293(b) of the Internal Revenue Code of 1939, [2] in the case of the petitioner Griffin for each of the years 1943 and 1944. Upon the issue of fraud the burden of proof is upon the respondent. Section 1112 of the Internal Revenue Code of 1939.[3] Fraud is never presumed. It must be proved by clear and convincing evidence. Henry S. Kerbaugh, 29 B.T.A. 1014, affirmed (C.A. 1), 74 Fed. (2d) 749; Arlette Coat Co., 14 T.C. 751; Frank Imburgia, 22 T.C. 1002; Kurnick v. Commissioner (C.A. 6), 232 Fed. (2d) 678, affirming a Memorandum Opinion of this Court [14 TCM 106, Dec. 20,858(M); T.C. Memo. 1955-31]; Davis v. Commissioner (C.A. 7), 239 Fed. (2d) 187, affirming a Memorandum Opinion of this Court [14 TCM 294; T.C. Memo. 1955-87]. *51 Fraudulent intent can seldom be established by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518. Here the evidence is clear and convincing that the petitioner Griffin did agree to sell whiskey at overceiling prices to McDonough and Best and that he did receive overceiling payments of $152,175 in 1943 and $90,000 in 1944, and we have so found as facts. In so finding, we have not, *52 to any extent, relied upon the presumption in favor of the correctness of the respondent's determination, but have relied upon the record as a whole and in particular the testimony, which we believe to be truthful, of McDonough and Best, who testified in detail as to their payments, in some instances directly to Griffin. From our observation of the petitioner Griffin, his testimony, and the evidence as to his large and varied business activities, it is apparent that he is a man of intelligence. It is inconceivable that he would not have known that these payments constituted taxable income. Furthermore, it is inconceivable that such large amounts as are here involved could have been omitted by inadvertence in both years. Indeed, no such contentions are made by the petitioner Griffin, his contention being simply that no such overceiling payments were received. We think it is reasonable to conclude that his omission of these amounts was willful and with intent to evade tax. It is well settled that the respondent, in order to sustain his burden of proof of fraud, need not prove the precise amount of each deficiency attributable to such fraud, but only that a part of such deficiency *53 is attributable thereto. Section 293(b) and United States v. Chapman (C.A. 7), 168 Fed. (2d) 997, certiorari denied 335 U.S. 853. We hold that the respondent has met his burden of proving that a part of the deficiency in income tax of Berlin Griffin for each of the years 1943 and 1944 was due to fraud with intent to evade tax. Accordingly, Griffin is liable for additions to tax pursuant to section 293(b). Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: George K. Yetter, Docket No. 54098; H. Halpine Smith, Docket No. 54127.↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2). ↩
3. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩