David H. Weissman v. Commissioner. David H. Weissman and Anne Weissman v. Commissioner.
Weissman v. Commissioner
Docket Nos. 83778 and 83788.
United States Tax Court
T.C. Memo 1963-54; 1963 Tax Ct. Memo LEXIS 289; 22 T.C.M. (CCH) 206; T.C.M. (RIA) 63054; February 25, 1963
*289 Bernard H. Sokol, Esq., and Abraham Agran, Esq., 11 S. La Salle St., Chicago, Ill., for the petitioners. Arthur N. Nasser, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioners and additions to the tax under section 293(b) of the Internal Revenue Code of 1939 for the years and in the amounts as follows: Addition Under
Sec. 293(b),
Docket No.
Petitioners
Year
Deficiency
I.R.C. 1939
83778
David H. Weissman
1946
$22,130.69
$11,065.35
1947
25,660.76
12,830.38
1948
1,089.39
544.70
83788
David H. Weissman and Anne
1949
$16,574.10
$ 8,287.05
Weissman
1950
16,938.50
8,469.25
1951
167.74
The issues for decision are whether David H. Weissman in each of the taxable years 1946, 1947, and 1948, and David H. and Anne Weissman in each of the taxable years 1949 and 1950, realized net income in the amounts determined by respondent on the basis of increases in net worth plus non-deductible expenditures; and if there are deficiencies in income tax of David H. Weissman for the years 1946, 1947, and *290 1948, and David H. and Anne Weissman for the years 1949 and 1950, whether any part of the deficiency in each year is due to fraud with intent to evade tax. Petitioners have conceded the correctness of respondent's determination of the deficiency in income tax for the year 1951. Findings of Fact Some of the facts have been stipulated and are found accordingly. David H. Weissman, hereinafter referred to as petitioner, filed individual Federal income tax returns for the taxable years 1946, 1947, and 1948, and petitioner and Anne Weissman, his wife, filed joint Federal income tax returns for each of the taxable years 1949 and 1950, all such returns being filed with the district director of internal revenue at Chicago, Illinois. Petitioner was born in Russia in 1889 and came to the United States in 1911. He was given some money by his father before he came to the United States which he used upon his arrival in the United States to invest in a partnership with his two brothers. In 1912 he married his first wife, Bertha, and one child, Richard, was born of this marriage. Richard was born in 1917. In 1913 petitioner entered the Chicago College of Medicine and was graduated in 1917. *291 He was licensed to practice as a physician and surgeon on October 19, 1917. Sometime before graduating from medical school petitioner withdrew his interest from the partnership with his brothers and received the value of this interest in cash. Commencing in March 1918 petitioner interned at Kalamazoo State Hospital at Kalamazoo, Michigan with a starting salary of $900 per year, and on June 18, 1918, his salary from the hospital was raised to $1,000 per year. In October 1919 he entered into the private practice of medicine in Pageton, West Virginia. He returned to Chicago in 1920 and has remained in Chicago since that date. Upon returning to Chicago in January 1920, petitioner began the practice of medicine in an office with living quarters in which he and Bertha resided located in the rear thereof. Petitioner and Bertha resided in these quarters until 1926 when they were separated. In 1921 petitioner and Bertha had an interest in an association known as Mutual Fidelity Association of Chicago, which assoriztion lent money to its members. Petitioner and Bertha withdrew from this association around 1925. On October 11, 1926, petitioner in connection with the divorce proceedings *292 instituted against him by Bertha, filed an answer to petition for alimony pending appeal, in which he represented that he was unable to pay the sum of $40 per week or any such amount, that he had earned from his practice about $225 a month for the past 2 years, that he was without any means whatever except in a certain lot which he had had to default on account of lack of funds and which was then threatened with complete foreclosure, and that the only income he had was from his medical practice. On October 10, 1927, petitioner, in connection with the divorce proceeding, filed a subscribed sworn petition in the Circuit Court of Cook County, Illinois, in which he stated that since the entry of the Court's order to pay temporary weekly alimony and support to Bertha in the amount of $25 per week, his earnings had substantially decreased and did not exceed $225 a month, that he was unable to earn a sufficient amount to make the payment required of him by the Court including alimony and solicitor's fees and also discharge his own expenses so that in order to comply with the order of the Court he had been from time to time compelled to borrow money, and that he did borrow about $400 from *293 his brother and in addition thereto had also borrowed various other amounts of money from various other individuals who were pressing their claims against him. On July 23, 1928, Bertha filed an amended bill of complaint in the divorce proceeding in which she alleged that petitioner possessed real estate of a value of about $5,000 and personal property of about $4,000 and that he derived yearly income from the practice of medicine and surgery of about $7,000. On July 23, 1928, an anwser was filed on behalf of petitioner in the Circuit Court of Cook County to Bertha's amended bill of complaint for divorce in which petitioner denied that he was possessed of any real estate and averred that his only personal belongings were certain office furniture and equipment of very little value and denied that he derived a yearly income from his practice of $7,000 but averred that his net income after paying office expenses did not exceed $3,000. On July 23, 1928, the Circuit Court of Cook County granted Bertha a divorce from petitioner and ordered petitioner to pay Bertha weekly child support of $12 when their minor child was living with Bertha, or when the child was admitted to a private school *294 selected by the Court to pay all costs incident thereto. In 1930 petitioner married his present wife, Anne, and two children were born of this marriage. On September 18, 1931, petitioner, in connection with the Court's order of divorce from Bertha, filed a subscribed sworn petition in the Circuit Court of Cook County, in which he alleged that his monthly income did not exceed $250, that it was quite difficult to earn more because of the depression, and that it was impossible for him to continue monthly payments of $125 to keep his son, Richard, in a private school. In August 1936 petitioner consummated the purchase of a residence located at 104 South Waller Avenue, Chicago, Illinois from the Phoenix Mutual Life Insurance Company of Connecticut. The purchase price of the property was approximately $6,000. A portion of this property has been petitioner's residence since the spring of 1937. In January 1937 petitioner obtained a $4,000 mortgage loan on this property. On June 10, 1943, petitioner applied for and obtained a $2,700 first mortgage loan on the property at 104 South Waller Avenue from the National Bank of Commerce. The loan provided for monthly payments of $32.91 covering *295 principal and interest and was payable over a period of 8 years. The proceeds of the first mortgage loan were used to satisfy the balance of the previous loan on the property. In connection with the first mortgage loan from the National Bank of Commerce petitioner submitted a certified financial statement dated June 10, 1943, disclosing cash in banks of $500, equity in 104 South Waller Street of $7,316, annual income of $7,000, and no liabilities. For the period August 21, 1944, to May 14, 1946, petitioner served as a lieutenant commander in the United States Navy. During the course of petitioner's service in the Navy, he was in charge of a naval hospital and dispensary located at Rockdale, Illinois, a city approximately 42 miles from Chicago. Petitioner maintained his office for the practice of medicine during the time of his service in the Navy and another doctor looked after his patients for him. Upon his discharge from the Navy petitioner resumed his practice of medicine but was away from his office for several months beginning approximately with the time of his discharge from the Navy because of illness. During the years 1946 through 1950 petitioner was engaged in the practice *296 of medicine including the practice of obstetrics and gynecology. During these years he was away from his office on several occasions due to illness. During 1946 and up to and including part of 1949 petitioner's office was located on West Madison Avenue [Street], Chicago, Illinois and during the balance of 1949 and throughout 1950 his office was located on South Pulaski Road in Chicago. Petitioner's income tax returns for the years 1946 through 1950 were prepared by a certified public accountant on the basis of information furnished by Ann Grant Greenberg Segal, who was employed by petitioner to act in the capacity of a nurse and secretary-bookkeeper. She had been employed by petitioner in 1936, and during the taxable years 1946 through 1950 maintained such records as were kept of petitioner's income-producing activities under his direction and supervision. The records of petitioner's medical practice consisted of daily appointment books, the entries therein listing names of patients, dates of visits, fees charged such patients, daily total receipts, and weekly total receipts as shown by these records, and year-end and monthly recapitulations of such records. The fees recorded *297 in the daily appointment books generally ranged in amounts from $5 to $20. Petitioner's secretary-bookkeeper prepared annual summaries reflecting the information recorded in the daily appointment books, annual expenses and rental income and furnished these summaries to petitioner's accountant who prepared his income tax returns for the taxable years here involved from this information. For the years 1938 through 1944 petitioner paid income tax as follows: Credited
Tax Paid or
Credits
to Esti-
Year
Credited
Allowed
mated Tax
1938
$ 39.50
1939
14.60
1940
22.68
1941
164.10
1942
376.66
1943
485.62
$ 70.76
1944
1944
890.28
195.52
1945
The income tax returns filed by petitioner for the taxable years 1945 through 1950 disclose income from medical practice and other sources as follows: Medical Practice
Gain From
Salary
Dividends
Sale of
Gross
Net Profit
Net
U.S.
and
Capital
Year
Receipts
or (Loss)
Rents
Navy
Interest
Assets
1945
$2,500.00
$ (294.67)
$309.12
$3,500.00
1946
5,616.67
2,168.18
108.30
1947
6,800.00
2,815.49
278.28
1948
7,050.00
1,618.20
31.66
1949
8,075.00
1,818.35
18.03
$ 246.00
1950
5,280.00
(577.17)
(318.14)
3,275.00
$5,004.39
*298 During the taxable years here involved petitioner cared for patients from whom he received payments as follows: Month of
Amount of
Type of
Name of Patient
Payment
Payment
Payment
Mrs. Lola M. Arnswald
Aug. 1946
$250.00
Currency
Mrs. Blanche Blahut
Dec. 1946
180.00
Currency
Beverly Judae
Apr. 1946
150.00
Currency
Beverly Judae
Aug. 1947
200.00
Currency
Julia Postol
Feb. 1947
200.00
Currency
Miss Ann Quiny
Apr. 1947
300.00
Currency
Miss Ann Quiny
July 1948
300.00
Currency
Lillian Valsuk
July 1948
250.00
Currency
Evelyn M. Anderson
Oct. 1948
250.00
Currency
Carolyn Gilbert
Nov. 1948
250.00
Currency
Mrs. Ruth Wayne
Aug. 1949
125.00
Currency
Mrs. Bessie Ring
Jan. 1949
260.00
Currency
Mrs. Margaret Melone
Jan. 1950
250.00
Currency
Miss Mary Saisi
July 1950
225.00
Currency
A. N. Cornell
Dec. 1950
500.00
Currency These payments were not recorded in the daily appointment books maintained and were not included in the income tax returns filed by petitioner for the taxable years 1946, 1947, 1948, 1949, and 1950. The following schedule shows the assets owned and liabilities owed by petitioner on the dates *299 indicated and the nondeductible expenditures made by petitioner during the years indicated. Assets
12/31/45
12/31/46
12/31/47
1. Cash in bank - National
Bank of Commerce -
Chicago
$ 1,497.32
$ 2,067.13
$ 3,446.69
2. Brokerage account - Se-
curities inventory
3. U.S. Government Bonds
(at cost)
8,962.50
8,962.50
8,962.50
4. Congregational Bonds (at
cost)
5. Loan Receivable R. Bur-
ton
Real Estate Investments
6. Land - 104 S. Waller
Ave., Chicago (at cost)
2,500.00
2,500.00
2,500.00
7. Frame Building - 104 S.
Waller Ave., Chicago
(at cost)
11,000.00
11,000.00
11,000.00
8. Improvements - 104 S.
Waller Ave., Chicago
(at cost)
3,468.91
3,468.91
9. Improvements - 104 S.
Waller Ave., Chicago
(at cost)
10. 1/2 Interest - Farm Ber-
rien Co., Mich. (at
cost)
8,000.00
8,000.00
8,000.00
11. Investment - Island
Apartments, Inc. Calif.
(at cost)
39,000.00
80,050.00
12. Office equipment (at
cost)
2,000.00
2,000.00
2,000.00
13. Art objects (at cost)
2,278.00
14. Art objects (at cost)
15. Art objects (at cost)
16. Art objects (at cost)
17. Mink Cape
Automobiles
18. 1941 - Buick (at cost)
1,050.00
1,050.00
1,050.00
19. 1948 - Cadillac (at cost)
Total Assets
$35,009.82
$78,048.54
$122,756.10
Liabilities
20. Mortgage Loan - Prop-
erty - 104 S. Waller,
Chicago
$ 1,584.00
$ 1,084.00
$ 584.00
21. General Finance Co. Auto
Loan
Depreciation Reserve
22. Frame Building - 104 S.
Waller, Chicago
4,685.73
4,847.64
5,009.55
23. Improvements - 104 S.
Waller, Chicago
34.69
104.07
24. Improvements - 104 S.
Waller, Chicago
25. Office equipment
1,600.00
1,800.00
2,000.00
Total Liabilities
$ 7,869.73
$ 7,766.33
$ 7,697.62
Nondeductible expenditures
$ 5,194.68
$ 7,959.67
*300 Assets
12/31/48
12/31/49
12/31/50
1. Cash in bank - National
Bank of Commerce -
Chicago
$ 356.00
$ 7,320.56
$ 6,532.21
2. Brokerage account - Se-
curities inventory
25,275.29
33,785.24
3. U.S. Government Bonds
(at cost)
9,318.75
9,318.75
9,337.50
4. Congregational Bonds (at
cost)
200.00
200.00
200.00
5. Loan Receivable R. Bur-
ton
12,700.00
Real Estate Investments
6. Land - 104 S. Waller
Ave., Chicago (at cost)
2,500.00
2,500.00
2,500.00
7. Frame Building - 104 S.
Waller Ave., Chicago
(at cost)
11,000.00
11,000.00
11,000.00
8. Improvements - 104 S.
Waller Ave., Chicago
(at cost)
3,468.91
3,468.91
3,468.91
9. Improvements - 104 S.
Waller Ave., Chicago
(at cost)
1,060.00
1,060.00
10. 1/2 Interest - Farm Ber-
rien Co., Mich. (at
cost)
8,000.00
8,000.00
8,000.00
11. Investment - Island
Apartments, Inc. Calif.
(at cost)
80,050.00
87,550.00
106,250.00
12. Office equipment (at
cost)
2,000.00
2,285.00
2,285.00
13. Art objects (at cost)
2,278.00
2,278.00
2,278.00
14. Art objects (at cost)
1,900.50
1,900.50
1,900.50
15. Art objects (at cost)
487.93
487.93
16. Art objects (at cost)
1,740.63
17. Mink Cape
1,980.00
Automobiles
18. 1941 - Buick (at cost)
19. 1948 - Cadillac (at cost)
4,306.00
4,306.00
4,306.00
Total Assets
$125,378.16
$166,950.94
$209,811.92
Liabilities
20. Mortgage Loan - Prop-
erty - 104 S. Waller,
Chicago
$ 84.00
21. General Finance Co. Auto
Loan
1,050.00
Depreciation Reserve
22. Frame Building - 104 S.
Waller, Chicago
5,171.46
$ 5,333.37
$ 5,495.28
23. Improvements - 104 S.
Waller, Chicago
173.45
242.83
312.21
24. Improvements - 104 S.
Waller, Chicago
10.60
31.80
25. Office equipment
2,000.00
2,014.25
2,042.75
Total Liabilities
$ 8,478.91
$ 7,601.05
$ 7,882.04
Nondeductible expenditures
$ 6,546.20
$ 8,263.84
$ 10,802.39
*301 Safe-deposit box No. 954 with the Park Safe Deposit Company was taken out by Julia Kahn with petitioner as deputy, and entries thereto were made in the years and on the dates indicated: 1945
1946
1947
1948
1949
1950
1951
Mar. 3
Jan. 2
Mar. 4
Jan. 5
No entries
No entries
Feb. 2
Mar. 31
Apr. 9
Oct. 7
Aug. 7 (at
June 21
Apr. 29
Oct. 27
10:20 a.m.)
Nov. 17
May 21
Dec. 31
June 6
July 24
Aug. 10
Aug. 31
Sept. 5
Oct. 22
Oct. 30
At the time of the entry of February 2, 1951, the box was closed and given up by the principal holder and petitioner as deputy. Julia Kahn accompanied petitioner in the entry to the box on November 17, 1945, and all of the other listed entries for the years 1945 through 1951 were made by petitioner alone. Safe-deposit box No. 6617 at the Merchant's National Bank in Chicago was held by petitioner. Petitioner made the following entries to this box for the years and on the dates indicated: 1946
1947
1948
1949
1950
1951
January 2
January 7
January 5
January 7
April 14
February 2
January 10
January 24
February 11
March 22
May 24
February 5
May 13
March 5
March 5
April 6
June 15
March 14
October 31
April 21
March 16
May 11
June 22
June 25
May 14
August 7
May 26
October 3
July 31
June 3
August 30
June 20
October 4
September 1
June 6
December 17
July 9
October 18
June 25
September 1
November 8
June 28
October 31
November 17
August 25
November 20
August 26
November 28
October 7
November 19
*302 Petitioner made deposits in the Island Apartments, Inc., account at the National Bank of Commerce in Chicago on the dates and in the amounts as follows: Date
Amount
1946
October 22
$10,000.00
November 6
29,000.00
1947
January 7
673.00
February 4
10,000.00
April 21
10,650.00
May 22
10,400.00
June 9
186.00
June 25
10,000.00
August 11
426.34
August 22
55.37
October 4
340.19
October 22
328.73
November 29
221.08
December 29
329.56
1948
January 31
352.62
February 21
323.56
April 1
98.86
1949
January 7
6,000.00
August 30
500.00
November 14
1,500.00
1950
April 14
1,000.00
June 15
5,000.00
June 28
12,700.00
Between the period 1943 to 1945 petitioner consulted a real estate agent in Chicago with respect to the purchase of real property. During this period the agent showed him two pieces of real property in Chicago, the asking prices of which were around $150,000 each. Petitioner made no offers to purchase either of these properties. In 1948 this agent showed petitioner another property in Chicago which petitioner offered to purchase for $145,000 and gave the agent a check for $75,000 with the offer. The offer was not accepted *303 by the owners of the property because they received a higher offer from another person. The real estate agent who showed petitioner these properties had no personal knowledge of whether or not petitioner had the money with which to purchase the properties. On January 17, 1956, petitioner was indicted for willful attempt to evade and defeat payment of income tax for the taxable years 1949 and 1950. On November 26, 1956, petitioner pleaded nolo contendere to count one of the indictment relating to the taxable year 1949 and was adjudged guilty open this plea. Count two relating to the layable year 1950 was dismissed on motion of the Government. Respondent in his notice of deficiency determined on the basis of increases in net worth plus nondeductible expenses that petitioner for the taxable years 1946, 1947, and 1949, and petitioner and Anne, his wife, for the taxable years 1949 and 1950, had net income in the following amounts: Year
Net Income
1946
$47,104.80
1947
52,340.94
1948
8,017.97
1949
49,992.66
1950
50,737.24
There are deficiencies in petitioner's income tax for each of the years 1946, 1947, and 1948 and in petitioner's and Anne Weissman's income *304 tax for the years 1949 and 1950, some part of which in each such year is due to fraud with intent to evade tax. Opinion In the instant case respondent has shown that petitioner's books did not reflect all his income and respondent has determined petitioner's income by the net worth method. The burden is on petitioner to show error in the taxable income and deficiencies in tax thus determined by respondent. Frank Imburgia, 22 T.C. 1002, 1010 (1954). Petitioner agrees with the net worth statement as prepared by respondent, except that he contends that as of December 31, 1945, he had between $145,000 and $150,000 in currency, partially at home and partially in a safe-deposit box, and that this cash had been primarily accumulated from his earnings from his medical practice throughout the years from 1917 through 1944. He testified that all of the amount had been accumulated from receipts from his medical practice in these years, except the sum of $12,000 which he received sometime prior to 1917 upon the dissolution of the partnership with his brothers, the sum of $24,000 ($12,000 for himself and $12,000 for his first wife, Bertha), which he received around 1925 upon withdrawal *305 from the Mutual Fidelity Association, and some $7,000 which he received as a gain on real estate transactions in the 1920's. Petitioner did not state with any precision, except as to these amounts, the years in which this currency was accumulated, what his total earnings from his medical practice were in any year prior to 1944 but stated that in all the years up to 1945 he had accurately reported his earnings on income tax returns but had not filed any income tax returns prior to 1937. Petitioner also failed to account for how he was able to retain whatever amount he did receive upon the dissolution of the partnership with his brothers and still have the funds to attend medical school, serve at a small salary as an interne and defray the expenses of support of a wife and child. He also offered no explanation of the source of the money necessary to defray the expenses incident to his divorce from Bertha and the support of their child, as well as the support of his second wife and their two children other than earnings of an amount which did not require the filing of Federal income tax returns until around the year 1937 or 1938, and earnings which resulted in taxable income for the *306 years 1938 through 1944 requiring only the payments of income tax for those years set forth in our findings, and net income of only $3,514.45 for the year 1945. While there is some corroborating testimony by petitioner's first wife, Bertha, that he received some money upon the dissolution of the partnership with his brothers and upon withdrawal from the Mutual Fidelity Association and from a real estate transaction during the 1920's, her testimony does not corroborate the amount which petitioner testified he received from these transactions and does indicate that his expenses at least through medical school were defrayed from the amount received upon his withdrawal from the partnership with his brothers. Bertha in her testimony stated that petitioner made a lot of money from his medical practice in the 1920's, around $18,000 or $20,000 a year, but admitted that this was merely an estimate made from seeing him count his receipts. Opposed to this is her allegation in her amended bill of complaint in the divorce proceeding that his yearly earnings were approximately $7,000. In view of the other evidence in the record, petitioner's testimony that he had accumulated prior to December 31, 1945, approximately *307 $145,000 in cash is not plausible. Some of the evidence in the record does tend to create some suspicion that perhaps petitioner had been, in years prior to 1946, receiving income in excess of that which he reported on his tax return even though he did testify that he had correctly reported his income in all years prior to 1946, and that he might have retained some of such income in a cash accumulation. One combination of facts which creates such suspicion is that in the years 1946 through 1950 petitioner received large currency payments for medical services rendered to recipients to whose names the parties have stipulated with the prefix "Miss" when his practice included obstetrics and gynecology. A natural suspicion is created that there may have been similar receipts by petitioner in prior years which were not reported in his income tax return which may have furnished a source of some accumulation of cash. The testimony of a real estate agent that in years prior to 1946 petitioner was looking over certain properties in Chicago with asking prices around $150,000 creates a suspicion that petitioner either may have had funds which he could consider using at least as a down payment *308 for the purchase of such property or contemplated being able to acquire such funds at an early date. The real estate agent, in his testimony, made it clear that he had no knowledge whatsoever of whether petitioner did have such funds. Suspicions of the character created by this record cannot substitute for evidence where the burden is upon petitioner to show error in respondent's determination. Also, these suspicions are merely that petitioner may have accumulated some funds during the years prior to 1946 and give no indication of the amount of such funds he may have accumulated. In this connection it is to be noted that the net worth statement prepared by respondent, and with which petitioner agrees except for his contention that he had approximately $145,000 in cash in addition to the assets shown therein, lists petitioner's assets at December 31, 1945, as having a cost basis of $35,009.82 with liabilities of only $7,869.73, leaving a net worth of $27,140.09. From the evidence in the record as to petitioner's income and financial situation prior to 1946, it is difficult to see how petitioner with the earnings he reported for income tax purposes could have accumulated a sufficient *309 amount to have acquired assets in this amount as of December 31, 1945. The evidence shows that in the years 1926 through 1931 petitioner filed, in connection with his divorce proceeding, a number of documents, some of them sworn, in which he denied having any assets and stated that his income did not exceed $225 to $250 per month. If these statements of petitioner were in fact true, then any funds which he had received upon the dissolution of his partnership with his brothers or upon his withdrawal from the Mutual Fidelity Association or from any real estate dealings during his marriage to Bertha had been used by him for purposes other than making investments sometime prior to his divorce from Bertha. On June 10, 1943, petitioner, on a certified financial statement, showed no assets except cash in banks of $500 and equity in 104 South Waller Street, Chicago of $7,316. Petitioner reported no large amounts of taxable income in any taxable year in which he filed an income tax return. In the light of all this evidence, we do not consider petitioner's testimony that prior to 1946 he had accumulated cash in the amount of approximately $145,000 which he had at that time in currency *310 to be credible. Since petitioner's only basis of contending that there is error in respondent's computation of his income based on the net worth plus nondeductible expenditures method is that he had currency of approximately $145,000 to $150,000 as of December 31, 1945, we sustain respondent's determination of deficiency for the years 1946 through 1950. We have not overlooked the evidence that starting at least by 1945 petitioner had one safe-deposit box in his name solely, that he had another safe-deposit box jointly with another person, that he made certain visits during the years 1946 through 1951 to these boxes, and that in some instances his deposits to the bank account he had in connection with the Island Apartments, Inc., coincided with dates of visits to these safe-deposit boxes. However, the first of these dates of coincidence was in the latter part of October 1946, and, therefore, we do not consider this persuasive evidence that petitioner had accumulated a large amount of currency prior to 1946, particularly since the record shows that petitioner had made nine entries during 1946 to the joint safe-deposit box and three entries to his individual safe-deposit box prior *311 to the entry in the latter part of October 1946 which coincided with a deposit to the Island Apartments, Inc. account. The burden of proof with respect to a part of the deficiency in each of the years were involved being due to fraud with intent to evade tax is, of course, upon respondent. The evidence is clear and convincing that some part of the deficiency in each such year was due to fraud with intent to evade tax. The evidence shows that on petitioner's books of account his fees were entered in amounts ranging from $5 to $20 and also shows that in April, August, and December 1946, petitioner received fees in currency of $150, $250, and $180, respectively, which were not entered in the appointment book and not reported on his tax return. For the years 1947, 1948, 1949, and 1950 similar payments in currency are shown in amounts ranging from $125 to $500 each from patients for whom he cared but these payments likewise were not on his appointment books nor reported on his Federal income tax returns. While the total amount of actual currency payments received in each of the years 1946 through 1950 as shown by the stipulated facts herein and set forth in our findings is not large in *312 proportion to the deficiency determined by respondent, it is reasonably substantial in proportion to the gross receipts from medical practice reported by petitioner on his income tax returns and because of there being large currency payments at one time as distinguished from the smaller payments of $5 to $20 as recorded on the appointment books, we are convinced that petitioner's failure to report these payments on his income tax return was not due to oversight or negligence but was a deliberate omission. The failure to report income which could not reasonably have been overlooked is strong evidence of fraud. Cf. Louis Halle, 7 T.C. 245, 251 (1946) 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950). Petitioner testified in this case but offered no explanation for failure to report these currency payments and made no statement concerning the nature of the care given to the patients by whom such payments were made in currency or why payments in such substantial amounts were in currency. The omission of these relatively large payments received by petitioner from his income in each of the years here involved with the inclusion of only the small *313 $5 to $20 payments as shown on his daily appointment record as the gross receipts from his medical practice, we consider to be clear and convincing evidence that a part of the deficiency for each of these years was due to fraud with intent to evade tax. In addition to this direct evidence of omission of income by petitioner the record shows large increases in petitioner's net worth in each of the years with no plausible explanation therefor, leaving the clear inference that such increases must represent unreported income. Such consistent substantial understatement of income is also persuasive evidence of fraud. W. A. Shaw, 27 T.C. 561, 573 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). The evidence is clear and convincing that a substantial amount of the increases in net worth was a result of unreported income received during the year. Not only is this shown from the prior statements as to lack of assets made by petitioner, but even petitioner's testimony in this case, as unplausible as it is, leaves substantial portions of the increases unexplained. Petitioner testified he had $145,000 to $150,000 in cash accumulated prior to 1946 and also testified that *314 in 1948 he brought $65,000 or $70,000 of this cash to his office to go through with a real estate purchase which did not materialize, in effect saying that he had at least this amount of the prior accumulation still in cash in 1948 which would have left available from the claimed cash accumulation, a maximum of $80,000 for investment in 1946 and 1947. However, petitioner's agreed total increases in net worth in those 2 years were approximately $88,000 and his agreed total nondeductible expenditures in those 2 years were approximately $8,000 in excess of the total net income he reported on his income tax returns for the 2 years. Therefore, whatever suspicions may exist that petitioner, as of December 31, 1945, might have had some amount of currency in addition to his assets as determined by respondent at that date, the evidence is clear and convincing that a substantial portion of petitioner's increases in net worth during the years 1946 through 1950 was from unreported income in those respective years. It is not necessary that respondent show the exact amount of the deficiency to establish fraud so long as he does show that there is a deficiency, a part of which is due to fraud with *315 intent to evade tax. Cf. W. A. Shaw, supra.
We hold that a part of the deficiency in petitioner's income tax for each of the years 1946, 1947, and 1948, and a part of the deficiency in petitioner's and Anne Weissman's income tax in each of the years 1949 and 1950 was due to fraud with intent to evade tax and sustain respondent's determination of addition to tax under section 293(b) of the Internal Revenue Code of 1939 for each of these years. Because of petitioner's concession with respect to the year 1951, and the statement of counsel made at the trial with respect to the unapplied payment of the deficiencies and additions to the tax for certain of the years here involved, Decision will be entered under Rule 50.