Frank Imburgia, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 38559.   Filed August 5, 1954.

*Kalman A. Goldring, Esq.*, for the petitioner.
*John J. O'Toole, Esq.*, for the respondent.

1006

OPINION.

Fisher, *Judge:*

*Statute of Limitations.*

Petitioner maintained in his pleadings that the statutory notice of deficiency applicable to the years in question was issued after the expiration of the statute of limitations as to both 1945 and 1946. Written waivers were introduced into evidence, executed by both petitioner and the Commissioner of Internal Revenue, consenting to the extension of the periods of limitation applicable to both 1945 and 1946 to June 30, 1952. The statutory notice of deficiency was mailed on December 19, 1951. Petitioner did not question the validity or genuineness of the waivers. We, therefore, find for respondent on this issue without the necessity of here considering the effect of our findings on the issue of fraud.

*Application of Method of Net Worth Increase Appropriate Upon the Facts.*

The Triton Hotel, first as a restaurant and bar, and later as a restaurant and nightclub, purchased and sold food and beverages. Its records, to the extent that they were kept, consisted of a single entry bookkeeping system, utilizing an account book to record purchases and sales of food and beverages, and also to record the expenses of the business. The entries as to receipts were made from guest checks and cash register tapes.

No inventory records were maintained for 1945. A Kardex record was kept from which a closing inventory for 1946 was determinable, but there was no record basis for an opening inventory for that year.

Petitioner made substantial expenditures in both 1945 and 1946 for capital improvements, some of which expenditures were not recorded on his books.

During both 1945 and 1946, petitioner's deposits in the Triton Hotel bank account exceeded his reported (and recorded) receipts, which excesses were accentuated by substantial cash expenditures.

Petitioner's books and records did not show the source of substantial funds expended for capital improvements, and afforded no basis for reconciling bank deposits and cash expenditures with reported receipts.

Section 22 (c) of the Internal Revenue Code provides, in part, as follows:

Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe * * *

Implementation of the provisions of section 22 (c) may be found in Regulations 111, providing in part as follows:

SEC. 29.22 (c)–1. NEED OF INVENTORIES.—In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *

See also Regs. 111, sec. 29.41–3 (1).

Apart from the question of inventories, the fact that bank deposits plus cash expenditures substantially exceeded receipts presents a situation which of itself requires careful investigation and appropriate testing on the part of the taxing authorities, especially where there are no contemporaneous entries or records disclosing whether the source of such expenditures is current income, or income accumulated in past years, or capital; and where there are no records which furnish the basis for an orderly reconciliation.

*Petitioner asserts* that the excess deposits and cash expenditures came from cash funds accumulated over a period of years by the Imburgia family, which cash had been kept for some years "in a safe in an alcove hidden by a curtain." He urges, therefore, that the failure to record it on the books did not affect the clear reflection of income. This argument obviously begs the very question with which we are confronted (and which confronted respondent). *If* the expenses were *not* paid from current income, the failure to record the transactions on the books would not prevent reflection of current income in any way here material. *If*, on the other hand, the excesses *were* paid from current income, the result of failure to record or account for the source of the funds is obvious.

The proper determination of the question of the source of the funds is discussed later in connection with the fraud issue. Here it suffices to say that the respondent would have been derelict in his duty if he had merely accepted petitioner's assertion without applying appropriate tests and without using appropriate means to ascertain, as nearly as may be, what the true income of petitioner was for the years in question.

It is our view, upon the record, that the use of the net worth method is appropriate here, both as a test of the accuracy of petitioner's income tax returns and as valuable evidence of his correct net income for the years in question. *Morris Lipsitz*, 21 T. C. 917; *Carmack* v. *Commissioner*, (C. A. 5) 183 F. 2d 1, certiorari denied 340 U. S. 875. The necessity for the use of the method of net worth increase arose out of petitioner's failure to keep adequate and complete records which would have clearly reflected income. Moreover, petitioner, in operating a restaurant and bar, in which the sale of food and beverages was an income producing factor, should have used the accrual method

of accounting, and should have filed his income tax returns on the accrual basis. His failure to maintain inventories and to reflect such inventories in his accounting, while at the same time reflecting accounts payable, resulted in a hybrid method which in itself prevented the clear reflection of income.

### Determination of Taxable Net Income.

Respondent's determination is prima facie correct, and the burden of proof is here upon the petitioner except that in respect of any new matter pleaded in his answer, it is upon the respondent. Tax Court Rules of Practice, Rule 32.

In respondent's statutory notice of deficiency, he determines "net income adjusted" for each of the years in question, and explains that such determination is on the basis of increase in net worth. He makes no particularized determination in the statutory notice of the factors which make up such increase. Particulars are affirmatively set forth, however, in his answer and amended answer.

In the determination of net income by the use of the method of net worth increase, the increase so found must be supplemented by the addition of the amount of petitioner's personal expenditures. In questioning the correctness of respondent's determination of net income and deficiencies for the years involved, petitioner faced the burden of establishing at least an outside limit of such personal expenditures. The only evidence produced was to the effect that petitioner and his family lived frugally. Respondent's answer and amended answer include an item of $1,000 for "estimated personal expenditures" for each year. In the absence of testimony on petitioner's behalf in this respect, we accept respondent's allegations as a limit upon the amount of such personal expenditures and, accordingly, attribute thereto the sum of $1,000 for each year. However frugally petitioner may have lived, there is no basis in the record for further limitation upon such amounts.

Subject to the foregoing, our determination of net income for 1945 and 1946 is, for the reasons already indicated, based upon increase in net worth which, in the instant case, we find is reliable evidence of petitioner's taxable net income for the years in question.

In making our determination, we have included no item of cash, other than cash in bank, for the reasons to be discussed in relation to the issue of fraud.

Both petitioner and respondent introduced into evidence detailed statements purporting to demonstrate net worth increases (unaffected by cash on hand) for 1945 and 1946. In some respects, they are identical. In others, the approach differs materially. Petitioner's com-

putation reflects a lesser increase in 1945 than respondent's, but a greater increase in 1946. If both years are taken together, a comparison of the total increase for the 2 years in each computation exhibits remarkably little difference, and may be taken as some indication of the substantially accurate over-all result.

After careful examination and analysis, and for the reasons hereinafter set forth, we have adopted in toto the "Listing of Assets and Liabilities at Cost," which is the equivalent of a net worth increase statement, prepared by the witness Reifer and presented by him on behalf of petitioner.

The witness is a certified public accountant, who has served as an income tax examiner and senior income tax examiner of the Department of Taxation and Finance of the State of New York, and also as an internal revenue agent. His testimony impresses us as reliable.

The witness prepared his "Listing" or net worth statement on the basis of his own investigation of petitioner's affairs for 1945 and 1946, which included consideration of stipulated facts, examination of petitioner's books and records, ascertainment of accounts payable and loans payable, and his own calculation of inventories (except for the closing inventory for 1946, which he took from petitioner's Kardex records) on the basis of a formula to which reference will be made hereafter. His source material was not produced at the trial of the case, but the same may be said, in general, of the source material used by respondent's witness. At one point, respondent's counsel objected to the admissibility of petitioner's net worth statement on the basis that "there is no record in the case to substantiate these specific items." Later, the objection was withdrawn, counsel for respondent stating: "After having gone over the net worth statement which this is and having analyzed it, I come to the conclusion that there is no substantial difference between that exhibit and Respondent's Exhibit 1, in evidence." Respondent's Exhibit 1 is the net worth statement offered by his own witness, a special agent of the Internal Revenue Service.

Petitioner's net worth statement is thus in evidence without objection and may properly be considered by us for whatever it may be worth. In our opinion, it clearly reflects income, in the background of circumstances created by petitioner, and its approach is better adapted to the circumstances demonstrated by the record than that produced by respondent.

In the two net worth statements, the following items are identical: Cash in bank, land, building, building improvements as of January 1, 1945, furniture and equipment, and reserve for depreciation (furniture and equipment) as of January 1, 1945.

As to inventories, petitioner's net worth statement uses actual closing inventory as of December 31, 1946, and calculates inventory as of other

material dates by taking a ratio of inventory to accounts payable (trade) as of December 31, 1946, and applying the same ratio to accounts payable (trade) as of the beginning and end of 1945. Respondent devotes much of his brief to the effect that use of inventories is necessary to a clear reflection of income (with which contention we agree) and since actual inventories were not kept for 1945, a practical reconstruction was appropriate. It may be added to the credit of the witness (reflecting favorably on petitioner) that the inventory increased more than $20,000 for 1945, and decreased only about $9,000 for 1946 so that the calculation was, as a separate item, in effect an admission against interest. Respondent's net worth statement contained no item for inventories.

For the purpose of depreciation, petitioner's net worth statement separated building improvements from building equipment, and applied rates to each which we deem to be reasonable and based on difference in character of the assets. Respondent's statement lumped the two and applied a single rate. In our opinion, petitioner's approach is to be preferred.

In the reserve for depreciation for furniture and equipment, petitioner's deductions as of December 31, 1945, and December 31, 1946, exceed those of respondent, but the difference is too small to be significant.

Petitioner's statement accounts for the increase in value of petitioner's interest in the partnership, F. Imburgia & Sons. Respondent's statement fails to do so. It is not clear as to whether respondent contends that this item be treated separately and distinctly from the net worth statements. His brief would indicate the contrary. At all events, we consider petitioner's treatment appropriate and adequate.

Petitioner (again contrary to interest) includes an item of prepaid insurance as of December 31, 1946, which is not to be found in respondent's computation.

Respondent objects to the deduction, in petitioner's net worth statement, of liabilities for accounts payable (trade) and loans payable. Petitioner has included them (to his substantial interest for 1945, but to a lesser extent against interest for 1946). Respondent allowed no deduction for liabilities. In his brief, respondent says: "If such liabilities did exist there is no question but that they should be included. However, in the determination of the respondent no such liabilities as suggested by the petitioner existed."

Respondent further argues that the bookkeeper, Miller, testified that accounts payable for 1945 and 1946 were paid at the "conclusion of these years." The same witness testified that accounts payable were usually paid "by the 10th of the month following." If the two statements are read together, it seems obvious that as of December 31 of a particular year, there would be outstanding accounts payable

which would be paid in January. There is nothing here which is inconsistent with the petitioner's net worth treatment of such accounts.

As to loans payable, respondent argues that petitioner's sons who testified did not mention anything about such loans. The record fails to disclose that they were asked any questions on the subject matter. It discloses, however, that respondent's counsel considered petitioner's net worth statement overnight, after which he withdrew his objection to its admissibility. He did not cross-examine the witness Reifer as to the basis for ascertaining the liabilities, nor did he request any opportunity to examine into such basis with a view to demonstrating either a lack of foundation therefor or offering evidence in contradiction thereof.

The record is not as clear as it might be as to the basis for the deduction of the loans payable. The witness Reifer testified, without objection, that the amounts represented unexpended 1945 and 1946 profits of F. Imburgia & Sons (a partnership) and Lake Avenue Liquor Store (of which Sam Imburgia, petitioner's son, was sole proprietor), which were considered as going to Frank Imburgia (petitioner) and therefore loaned. Presumably the witness had ascertained that the amounts treated as loans had been availed of in the Triton Hotel business, and were reflected in its assets, thus affecting net worth increase on the asset side, and he, therefore, offset them by the liability to repay. In the absence of an explanation of similar import, the deduction of the liabilities without reflection in the assets would have amounted to an attempted fraud upon the revenue. There is no suggestion of this sort in relation to the witness, an experienced accountant and former revenue agent. No effort was made to clarify the issue on cross-examination, and since objection to the petitioner's net worth statement was withdrawn, we see no reason to disregard these factors, especially when the approach of the witness on other aspects of the statement appears sound. There would be as much basis for disregarding the factor of inventories, the inclusion of which was favorable to respondent's position.

Finally, as to the question of liabilities, respondent argues "that the original determination made by the Commissioner that the petitioner had no liabilities which should be included in his net worth, is correct and should not be disturbed." We point out, however, that the Commissioner made no such determination in his statutory notice of deficiency. It is true that his answer and amended answer contained exhibits of net worth computations which make no reference to liabilities, but this is not the equivalent of the determination which is urged upon us.

Since respondent agrees with the principle that liabilities should be included, and since we are satisfied to rely upon the uncontradicted

testimony on the point, we allow the deduction of the liabilities as disclosed by petitioner's net worth statement.

As already indicated, therefore, we have accepted petitioner's net worth statement (filed as Schedule A in our Findings of Fact) as convincing evidence of petitioner's net income for 1945 and 1946, and, on the basis thereof, we have determined such net income to be $63,271.41 for 1945 and $34,231.49 for 1946, representing the respective increases in net worth plus $1,000 in each year for living expenses.

### Fraud Issue.

Respondent contends that some part of the deficiencies determined for 1945 and 1946 were due to fraud with intent to evade tax within the meaning of section 293 (b) of the Internal Revenue Code, and has accordingly determined 50 per cent penalties. The burden is upon respondent to establish his contention by clear and convincing evidence. *Arlette Coat Co.*, 14 T. C. 751.

In deciding whether or not respondent has established fraud on the part of petitioner, we may consider the entire record properly before us, and are not limited to respondent's affirmative evidence on the fraud issue. *Wallace H. Petit*, 10 T. C. 1253, 1257; *L. Schepp Co.*, 25 B. T. A. 418, 440.

It is inherent, under the circumstances of this case, that, in the absence of admissions on the part of petitioner, respondent must rely upon circumstantial evidence if he is to establish his contention. Our own conclusion may be reached only upon the basis of detailed analysis of the record as applicable to the fraud issue.

Eliminating, for the moment, the question of whether or not petitioner had substantial cash on hand on January 1, 1945, the net worth statements offered by both petitioner and respondent clearly demonstrate substantial deficiencies for both 1945 and 1946. Petitioner admits that his expenditures for each year substantially exceeded his reported receipts from business for each year. His sole explanation, through witnesses produced on his behalf, is that he had at least $60,000 to $65,000 cash in a safe in his home on January 1, 1945, and that, except for loans for which he received credit in the net worth statement adopted by us, the cash on hand is the source of his expenditures in excess of receipts. He contends that if we accept the fact of the existence of such cash, and its use for expenditures during 1945 and 1946, the discrepancies are fully explained. We mention at this point that even if we accepted his statement as to cash on hand, the total net income for the 2 years in question, calculated on the net worth basis most favorable to his contention, still materially exceeds the sum of $65,000 plus the net income reported in his returns.

Petitioner's contention is that the cash which he claims to have had on hand was accumulated over a long period of years. While no details of the source of the funds, or the periods during which particular amounts were accumulated, is presented, petitioner does not contend the funds were acquired by gift, inheritance, or loan. The witnesses produced on his behalf, who were familiar with his affairs, likewise made no such suggestion. Petitioner himself did not testify. His son Ross, a doctor, explained the failure to testify on the ground that petitioner had had several heart attacks, and that personal appearance on the witness stand would be dangerous to him. Although the attending physician was not called, we see no reason to doubt the testimony of Dr. Ross Imburgia in this respect, and we, therefore, attach no significance to the failure of petitioner to testify. At the same time, we cannot, of course, conjure up what his affirmative testimony may have been had he appeared.

While on the subject of witnesses, we note that none of the employees of Triton Hotel testified except Sam Imburgia (manager, and son of petitioner) and James R. Miller (whose testimony was unsatisfactory in material respects). Likewise, Max Greenhouse, the accountant who prepared petitioner's income tax returns for the years in question, did not appear as a witness. The testimony of employees who handled the cash registers and guest checks, and those who made book entries under the direction of Miller, might have shed much light. Their failure to testify was not explained. We have no means of knowing what, if any, information Greenhouse may have had concerning the alleged cash in petitioner's safe.

Does the record properly before us establish, by clear and convincing evidence, that petitioner did not have $60,000 or $65,000 cash on hand, or any substantial cash on hand greater or less than those amounts, as of January 1, 1945?

In the three statements of financial condition which petitioner filed with the Genesee Valley Trust Company in 1940 and 1941, in reporting his "Cash on hand and in Banks," the amounts stated did not exceed $2,500 in any instance. In the statement filed by petitioner with the New York State Division of Alcohol Beverage Control as of March 30, 1943, in answer to the question "Personal cash available?" petitioner reported $5,000, and in answer to the question "Where kept?" states: "Genesee Valley Trust Company." It is our view that it may be reasonably inferred from the foregoing that, as of March 30, 1943, the total of petitioner's personal available cash was $5,000, and that this sum was in a bank, and not in a safe at home.

The trifling amounts of Federal income tax paid by petitioner for the years 1942, 1943, and 1944 (respectively $127.38, $276.16, and $496) exclude any reasonable inference that petitioner acquired

substantial cash between 1941 and January 1, 1945, especially since there is no contention on his behalf that cash funds were acquired by him through gift, inheritance, or loan. Since witnesses produced by him were familiar with his affairs, and his counsel was fully aware of the significance of the issue of cash on hand, we may assume that if the existence of substantial cash was explainable by gift, inheritance, or loan, evidence thereof would have been offered.

For the years 1932 to 1941, inclusive, petitioner either filed income tax returns showing no tax to be due, or filed no returns at all. We may infer therefrom that the funds were not accumulated during that period (or if they had been, reference would have been made to the existence of such funds in the reports to the trust company and the Division of Alcohol Beverage Control).

Between 1899 and 1910, petitioner was employed in coal mines and steel mills. There is no testimony as to his employment or business between 1910 and 1923. Part of the time he spent in Italy, and served with the Italian Army during World War I. In 1923, he settled in Rochester, New York, where he established a fruit and vegetable business with some packaged groceries in a store which his son described as 20 by 40 feet, in addition to which, in the summer, the front porch of his adjacent home was used as an outside stand.

Petitioner's activities from 1899 to 1932, as described in the stipulation of facts and the testimony of his son Sam gave no indication of the opportunity to accumulate substantial cash funds during such period. There is neither testimony nor contention on his behalf that the cash funds were accumulated prior to 1932, and his later statements to the trust company and the Division of Alcohol Beverage Control indicate that he did not have such funds in later years.

While we attach little weight to the circumstances under which petitioner and his family lived, we point out that, to the extent they are at all meaningful, they tend to support the contention of respondent rather than that of petitioner, on whose behalf the evidence in support thereof was offered. When his son Sam, a very active member of this closely knit family, needed $5,000 to go into the liquor business in 1941, the cash was not forthcoming. The money was borrowed from the bank with the father (petitioner) as cosigner. When Ross went to college (1939 to 1942), his father did not give him very much spending money. He earned his meals and spending money by waiting on table and, on weekends, clerking in a grocery store. The whole family lived very frugally, and, for a time at least, occupied one floor of a house, with the three boys sleeping in one room in one large bed. Later, the father, mother, three sons, and Sam's wife and two children, all occupied one house. No doubt the evidence of frugality and inexpensive living conditions was offered to create the inference of an

attitude of saving. We agree, but the point to which it was carried, even in later years, together with the financing of Sam's business and the treatment of Ross at college, was hardly indicative of the existence of substantial accumulated wealth.

We turn now to the affirmative evidence of the existence of the cash in the safe offered on behalf of petitioner. We point out that there were no entries on the books and no written records, contemporaneous or otherwise, tending to support the passage of any cash from petitioner's safe into the Triton Hotel business or business accounts.

Sam Imburgia, manager of the Triton Hotel, testified that there was at least $60,000 in the safe at home in 1945. He stated that, although the whole family knew the combination of the safe, he was the only one who could open it. He, therefore, not only had access to it, but opened it on the occasions when others counted or observed the cash, and was in a position to corroborate the testimony of his brother Ross and Anthony B. Campagna. He also stated that he had contributed some of the funds from his own earnings, but he didn't know how much. (As heretofore stated, to the extent of any amounts claimed to have been advanced by Sam to his father in either 1945 or 1946 from the Lake Avenue Liquor Store, loans payable have been set up in petitioner's net worth statement so that petitioner has received credit therefor.)

The testimony of Dr. Ross Imburgia is colorful. After earning his meals and most of his spending money in college, he attended the medical school of the University of Buffalo (where his tuition was at Government expense). During the Christmas holidays in 1944 (a very significant time for the purposes of this case) while in his third year of medical school, he and his mother discussed his graduation and the opening of an office "and the amount of money it would take." His mother said she had set aside $20,000 for him to open up an office. His testimony is then as follows: "I told her I wanted to see it. It was curiosity, no particular reason."

Sam was, of course, present. He opened the safe and took out the money, which Ross counted, thereby satisfying his curiosity. The amount of money was $60,000 to $65,000, according to the witness.

We progress to the testimony of Anthony B. Campagna. This witness testified that he was accustomed to handling large sums of cash in his business, i. e., $50,000, $75,000, $100,000. He had known petitioner for 25 years, was very friendly with him, and lived across the street. The witness had been in the restaurant business for 20 years, and owned properties.

A real estate man came to Campagna and suggested that he buy the Wilder Building in Rochester. Campagna told the real estate man he didn't think he could afford it, but would look into it. The witness

talked to Sam Imburgia about it and Sam asked him to come to the house and talk it over with his father. The witness tried to arrange with petitioner to buy the building. At one time petitioner agreed to go into the deal. It was on a Sunday in 1945 (another period of significance) and Campagna was asked to dinner. Sam, according to the witness, was overanxious for the deal, but petitioner wanted more details as to what he would get for his money. Finally, petitioner said: "All right, I will go in with you." Thereupon, this old friend of petitioner testified, "* * * and knowing the Imburgias as I do, I came right out with the point. I said that after all, Sam, I directed myself to Sam, have you got the money? In case I go into this thing I don't want to look foolish and not have the money or enough of it."

Sam reassured him, and obligingly opened the safe and pulled out some bundles of money. Sam said: "Go ahead and count it." The witness took one of the bundles, looked it over, and counted it. Each bundle was tied and had exactly $5,000 in it. There were eight bundles with $5,000 in each, with more money in the safe.

To complete the essence of Campagna's testimony, we add the anticlimactic note that Sam called a few days later and told Campagna that his father had thought it over and didn't want to go into the deal (with the result, of course, that the cash remained in the safe for the purposes of this case). Campagna handled the deal himself, arranging his own finances.

There are no further witnesses to the existence of the cash in the safe. The bias of the three above mentioned is apparent. We find the testimony on this point threadbare and unacceptable. It is urged upon us as uncontradicted, but, of course, there can be no possibility of express contradiction, and we are not bound to accept testimony which patently appears to be "highly improbable or manifestly unreasonable." *Carmack* v. *Commissioner, supra; Herbert* v. *Riddell*, 103 F. Supp. 369, 371.

We add that the fact that expenditures materially exceeded receipts during the years in question, with no contemporaneous book entries or records explaining or reconciling the discrepancies or recording the source and nature of the funds used, lends significant color, in the background of the surrounding circumstances, to the inference of fraudulent understatement of income.

From the whole record, we conclude that there is clear and convincing circumstantial evidence that petitioner did not have $60,000 to $65,000 cash on January 1, 1945; that there were substantial deficiencies in income taxes and understatements of income for the years 1945 and 1946; that some part of the deficiency in each year was due to fraud with intent to evade income taxes; and that the circumstantial evidence is such as to exclude any reasonable hypothesis to the contrary.                *Decision will be entered under Rule 50.*