Gambo Woo and Marion F. Woo v. Commissioner. Gambo Woo v. Commissioner.
Woo v. Commissioner
Docket Nos. 82260, 82261.
United States Tax Court
T.C. Memo 1963-278; 1963 Tax Ct. Memo LEXIS 66; 22 T.C.M. (CCH) 1412; T.C.M. (RIA) 63278; October 10, 1963
Samuel C. Waller, for the petitioners. Ford P. Mitchell, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in income tax and additions to tax as follows: Docket No. 82261
Additions to Tax, I.R.C. of 1939
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
1948
$ 4,360.24
$ 2,180.12
$ 392.43
$ 261.61
1949
2,465.84
1,232.92
222.55
148.37
1950
17,624.95
8,812.48
1,586.23
1,057.50
1951
10,067.82
5,033.91
918.97
612.64
*67 Docket No. 82260
Additions to Tax
Sec. 294
Sec. 294
Sec.
Sec. 293(b)
Sec. 6653(b)
(d)(1)(A)
(d)(1)(B)
294(d)(2)
Year
Deficiency
1939 IRC
1954 IRC
1939 IRC
1939 IRC
1939 IRC
1952
$14,809.52
$7,404.76
$1,367.14
$911.43
1953
9,827.90
4,913.95
929.55
619.69
1954
7,882.23
$3,941.12
$16.25
477.71
1955
6,155.82
3,077.91
In an amendment to his answer in Docket No. 82260 the respondent claimed an addition to tax under section 291(a) of the Internal Revenue Code of 1939 for the year 1953. Respondent now concedes the additions to tax under section 294(d)(2) of the internal Revenue Code of 1939 for the years 1948 through 1951 in Docket No. 82261 and for the years 1952 and 1953 in Docket No. 82260. The issues are (1) whether petitioners understated their income for the years 1948 through 1955 as determined by the net worth plus nondeductible expenditures method; (2) whether any part of the underpayment of income taxes for the years 1948 through 1955 was due to fraud; (3) whether any of the years 1948 through 1955 are barred by the statute of limitations; (4) whether petitioners are liable *68 for additions to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for the years 1948 through 1953 for failure to file declarations of estimated tax for those years; (5) whether petitioners are liable for additions to tax under section 294(d)(1)(B) of the Internal Revenue Code of 1939 for the year 1954 for failure to pay installment of estimated tax; (6) whether petitioners are liable for additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the year 1954 for substantially underestimating their estimated tax for that year; and (7) whether petitioners are liable for additions to tax under section 291(a) of the Internal Revenue Code of 1939 for the year 1953 for failure to make and file a return for that year within the meaning of the statute. Findings of Fact Some of the facts were stipulated and they are so found. Gambo Woo and Marion F. Woo, husband and wife, are residents of Augusta, Georgia. Gambo Woo filed individual income tax returns for the years 1948 through 1951 with the district director of internal revenue for the district of Georgia. Gambo Woo and Marion F. Woo filed joint returns for the years 1952 and 1954 with the district *69 director of internal revenue for the district of Georgia. Gambo and his wife submitted an unsigned income tax return for each of the years 1953 and 1955 with the district director of internal revenue for the district of Georgia. Gambo Woo shall hereinafter sometimes be called the petitioner. During the years 1948 through 1955 petitioner operated a retail grocery store. He received income from this source as well as from rents, interest, sales of property and other sources. The records of Young Wholesale Grocery Company show that 24,500, 88,900 and 90,480 pounds of sugar were purchased in the name of Gambo Woo d/b/a W. T. Woo Grocery during the years 1952, 1953 and 1954, respectively. The records of Smith Grocery Company show that 67,280 pounds of sugar were purchased in the name of Gambo Woo d/b/a W. T. Woo Grocery during the year 1955. Ernest Williams, an accountant, prepared the petitioner's income tax returns for the years 1949 through 1955. Williams also prepared petitioner's return for 1948, showing certain bond interest as taxable income, but petitioner prepared another return for 1948, which he filed, omitting the bond interest. Sometime after 1955 petitioner destroyed *70 his books and records for the years here relevant. Petitioner's father, W. T. Woo, came to the United States from China about the year 1923. W. T. Woo moved to Augusta, Georgia and operated a grocery store there until 1940 or 1941. In the spring of 1941 W. T. Woo went to Jacksonville, Florida, where he opened a grocery store. At that time W. T. Woo transported a safe to Jacksonville. W. T. Woo died in May 1941, and the store was operated by a friend of the deceased until it was closed later in the same year. W. T. Woo did not file any Federal income tax returns for the years 1928 through 1941. W. T. Woo purchased a parcel of land on June 2, 1940 for $1,250. He made a down payment of $750 and gave a security deed for the balance, which was payable in $50 monthly installments. The final return of the administrator filed in the Court of Ordinary, Richmond County, of the estate of W. T. Woo showed that W. T. Woo's estate at the date of his death consisted of $3,920 in cash, real estate valued at $6,550, inventory and fixtures valued at $3,350 and personal items valued at $325, for a total estate at the date of his death of $14,145. Petitioner came to the United States from China in *71 1928 at the age of 10 1/2 years. He attended school through the eighth grade. He was married in 1936 and from 1937 until sometime in 1940 he operated a grocery store in Augusta. In 1940 he took over the operation of his father's grocery store, which petitioner was operating at the time of the trial. During the years here relevant petitioner operated the store from about 7:30 in the morning until about 9 in the evening, seven days a week. His wife helped in the store. Petitioner and his wife had two children, Robert and Dorothy, during the years 1947 through 1955. In 1948 Robert was 10 years old and Dorothy was 7. Petitioner and his family lived in an apartment over the grocery store. From 1929 until at least 1943 a safe deposit box was held in the name of Woo Tung (W. T. Woo) or petitioner at the Citizens & Southern National Bank, August, Georgia. Petitioner did not file any Federal income tax returns for the years 1939 through 1942. For the years 1943 through 1947 petitioner filed returns which reflected a total taxable income for those years of $6,297. Petitioner did not file declarations of estimated tax for the years 1948 through 1953. It is stipulated that during the years *72 1948 through 1955 petitioners received interest on Series G and H United States Government bonds as follows: Year
Interest
Year
Interest
1948
$ 250.00
1952
$1,025.00
1949
512.50
1953
1,025.00
1950
850.00
1954
1,074.00
1951
1,025.00
1955
1,175.00 None of the above amounts of interest income was reported by petitioner or his wife on the income tax returns for the years 1948 through 1955. It is stipulated that during the years 1948 through 1955 petitioners received interest income from security deeds as follows: Year
Interest
Year
Interest
1948
$169.22
1952
$268.56
1949
179.89
1953
513.06
1950
228.95
1954
395.35
1951
202.55
1955
420.71 None of the above amounts was reported by petitioner or his wife on the income tax returns for the years 1948 through 1955. It is stipulated that petitioners received and reported interest on various bank and savings and loan accounts as follows: Amount
Interest
Amount
Not Reported
Year
Received
Reported
in Returns
1948
$ 89.22
$ 89.22
1949
77.89
77.89
1950
609.41
609.41
1951
1,119.25
$ 171.25
948.00
1952
1,921.69
383.20
1,538.49
1953
2,621.95
1,310.98
1,310.97
1954
2,895.42
1,599.24
1,296.18
1955
2,527.02
1,309.77
1,217.25
*73 The period of limitations for assessment and collection of the deficiencies for 1954 has not expired for the reason that petitioner and his wife executed a waiver on April 4, 1958 extending the time in which the deficiencies may be assessed to June 30, 1959. The notice of deficiency herein was mailed to petitioner and his wife on May 14, 1959. It is stipulated that petitioner was acquitted in a trial held in Federal District Court for the Southern District Division, Augusta, Georgia, on criminal tax fraud charges covering the years 1951 through 1955. Respondent computed petitioner's unreported income for the years 1948 through 1955 by the net worth plus nondeductible expenditures method as follows: Net Worth Schedule
Net Worth Schedule
12-31-47
12-31-48
12-31-49
ASSETS
Bank Balances
$ 8,797.79
$12,198.83
$10,491.95
Government bonds
13,518.75
24,018.75
34,018.75
Stocks and securities
Real estate
5,550.00
5,550.00
5,550.00
Security deeds receivable
1,525.75
2,216.76
1,759.79
Equipment and automobiles
1,826.10
Inventory
1,000.00
1,000.00
1,000.00
TOTAL ASSETS
$30,392.29
$44,984.34
$54,646.59
LIABILITIES AND RESERVES
Depreciation reserve
$ 1,134.24
$ 1,308.74
$ 1,665.85
NET WORTH
$29,258.05
$43,675.60
$52,980.74
Prior year's net worth
29,258.05
43,675.60
INCREASE IN NET WORTH
$14,417.55
$ 9,305.14
Add: Personal and Living Expenses: By cash - estimated
4,000.00
4,100.00
By checks
1,791.94
Federal income tax
7.00
Life insurance premiums
502.16
502.16
TOTAL
$18,926.71
$13,907.30
Less: Dividend Exclusion
CORRECTED ADJUSTED GROSS INCOME
$18,926.71
$13,907.30
Adjusted gross income per return
2,055.25
2,706.52
UNDERSTATEMENT OF INCOME
$16,871.46
$11,200.78
*74 Net Worth Schedule
Net Worth Schedule
12-31-50
12-31-51
12-31-52
ASSETS
Bank Balances
$33,236.65
$ 50,236.30
$ 82,216.59
Government bonds
47,037.50
47,037.50
47,056.25
Stocks and securities
Real estate
5,550.00
5,731.85
9,531.85
Security deeds receivable
4,530.76
6,971.56
7,541.61
Equipment and automobiles
1,826.10
5,826.10
6,026.10
Inventory
1,000.00
1,076.23
1,026.46
TOTAL ASSETS
$93,181.01
$116,879.54
$153,398.86
LIABILITIES AND RESERVES
Depreciation reserve
$ 2,022.96
$ 2,780.07
$ 3,557.18
NET WORTH
$91,158.05
$114,099.47
$149,841.68
Prior year's net worth
52,980.74
91,158.05
114,099.47
INCREASE IN NET WORTH
$38,177.31
$ 22,941.42
$ 35,742.21
Add: Personal and Living Expenses: By cash - estimated
4,200.00
4,300.00
4,400.00
By checks
1,791.94
Federal income tax
7.00
223.89
Life insurance premiums
502.16
949.76
1,060.10
TOTAL
$42,886.47
$ 28,191.18
$ 41,634.78
Less: Dividend Exclusion
CORRECTED ADJUSTED GROSS INCOME
$42,886.47
$ 28,191.18
$ 41,634.78
Adjusted gross income per return
2,157.49
3,469.94
4,554.56
UNDERSTATEMENT OF INCOME
$40,728.98
$ 24,721.24
$ 37,080.22
Net Worth Schedule
Net Worth Schedule
12-31-53
12-31-54
12-31-55
ASSETS
Bank Balances
$105,192.90
$ 81,531.03
$ 90,641.64
Government bonds
49,075.00
53,075.00
53,075.00
Stocks and securities
14,945.00
18,735.59
Real estate
9,531.85
40,531.85
50,781.85
Security deeds receivable
7,619.91
6,302.50
3,122.69
Equipment and automobiles
6,547.63
6,547.63
7,809.38
Inventory
1,046.20
1,218.60
1,192.60
TOTAL ASSETS
$179,013.49
$204,151.61
$225,358.75
LIABILITIES AND RESERVES
Depreciation reserve
$ 3,806.00
$ 5,281.26
$ 7,315.61
NET WORTH
$175,207.49
$198,870.35
$218,043.14
Prior year's net worth
149,841.68
175,207.49
198,870.35
INCREASE IN NET WORTH
$ 25,365.81
$ 23,662.86
$ 19,172.79
Add: Personal and Living Expenses: By cash - estimated
4,500.00
4,600.00
4,700.00
By checks
208.58
1,182.80
717.02
1,791.94
Federal income tax
462.00
956.30
762.53
Life insurance premiums
1,433.15
1,379.76
1,328.10
TOTAL
$ 32,943.76
$ 31,315.94
$ 27,755.36
Less: Dividend Exclusion
50.00
50.00
CORRECTED ADJUSTED GROSS INCOME
$ 32,943.76
$ 31,265.94
$ 27,705.36
Adjusted gross income per return
5,170.66
5,977.25
6,904.45
UNDERSTATEMENT OF INCOME
$ 27,773.10
$ 25,288.69
$ 20,800.91
*75 All of the amounts for the items included in the above computation of petitioner's unreported income have been stipulated, with the exception of the cash expenditures for personal living expenses, which respondent has estimated. A part of the deficiency or underpayment of tax for each of the years 1948 through 1955 was due to fraud. The returns filed by petitioner for the years 1948 through 1951 and by petitioner and his wife for the years 1952 through 1955 were false or fraudulent returns with intent to evade tax. Opinion Except for the estimate by respondent of petitioner's living expenses, the net worth computation as prepared by respondent is based wholly upon stipulated items and amounts. The only remaining dispute is over cash on hand as of December 31, 1947, the correctness of respondent's estimate of petitioner's personal living expenditures over the years 1948 through 1955, the amount of equipment petitioner had on hand as of December 31, 1947, and whether petitioner owned an automobile which should be listed among his assets as of December 31, 1947. Petitioner claims that he had $145,000 in cash on hand as of December 31, 1947. We cannot tell how petitioner arrives *76 at this particular figure. He contends on brief that, as of December 31, 1947, $100,000 was in the grocery store safe, $30,000 in a safe deposit box, and $10,000 in glass jars which were either buried behind the store or located in a trunk in their living quarters. As to the $100,000 in the safe (or safes), [1] petitioner testified that he saw "[lots] of money" in the store safe early in 1941, before his father went to Jacksonville; that his father placed $65,000 in a second safe which he took to Jacksonville; that after his father's death in May 1941 the safe was brought back with $43,000; that petitioner later received $20,000 from the sale of the Jacksonville grocery business; that the money in the grocery store safe was not counted by petitioner until 1950 or 1951, at which time there was between $95,000 and $100,000 in the safe. Petitioner also testified that when he was married in 1936 petitioner's father paid a dowery of $3,000 to the bride's father, who in turn gave it to the bride, who gave it to petitioner - and that it was placed in the store safe. There was also testimony by petitioner that his father gave $10,000 each to petitioner and his wife as a marriage gift and *77 that this, too, was placed in the safe. From all this, the petitioner "roughly guessed" there was $100,000 in the safe in 1947, or "something like that." As to the source of this cash, the petitioner states on brief that his father, at the time of his death in 1941, had "hoarded cash totaling $120,000." But the evidence in the record does not support this and, in fact, indicates that petitioner's father did not leave such an amount in cash when he died. W. T. Woo operated the grocery store (now owned by petitioner) for some years prior to his death, and from all we can tell, this was his only source of income. He did not file any Federal income tax returns for the years 1928 through 1941. In 1940, about a year before his death, he purchased a parcel of land for $1,250, paying only $750 down and arranging to pay the balance in $50 monthly installments. The final return of his administrator showed a total estate left by him amounting to $14,145, which included $3,920 in cash. All of this evidence strongly militates against the presence of any such cash hoard in 1941. *78 Petitioner's explanation that $20,000 (which was a portion of the money purportedly left by his father) came from the sale of his father's grocery business in 1941 is most improbable. W. T. Woo went to Jacksonville in March or April of 1941 and he died in May 1941. It appears that he rented space for his grocery store. The store was only in operation for a few months, at the most. Apparently the stock and fixtures were sold, but petitioner had no idea of the nature of the assets in the store that were sold, or to whom they were sold. From testimony in the record as to the size of the store and the neighborhood in which it was located, it cannot be inferred that any significant amount was realized from the sale of the store's stock and fixtures in 1941. Petitioner also asserts that some of the money left by his father was in glass jars, some of which were buried in the back yard and some of which were in a trunk. The jars (petitioner testified there were "somewhere around about forty, forty or fifty jars, something like that") supposedly contained mostly loose change, and they were dug up, according to petitioner, "somewhere in the fifties" one at a time to "[make] change for *79 the store." These jars, says petitioner, contained $10,000, though there is nothing in record to show that the money was ever counted or to indicate that the $10,000 figure is anything but the purest of guesses. This story of glass jars was not disclosed to respondent at any time during the investigation, and, in fact, was not mentioned by petitioner at the time of the criminal trial. Nor can we give much credence to the contention that there was some $43,000 in cash in the safe which was brought back from Jacksonville after W. T. Woo's death in 1941. There is no indication as to how this money could have been accumulated by W. T. Woo in the years prior to 1941, when he was operating a grocery store, especially in view of the evidence outlined above as to the nature of W. T. Woo's estate at the time of his death. As to the petitioner's contention that, in addition to the cash hoard left by his father, petitioner as of December 31, 1947 had some $30,000 in cash in a safe deposit box at Citizens & Southern National Bank in Augusta, it again appears that neither of the two revenue agents was ever told of the existence of this second safe deposit box during the investigation. [2] Petitioner *80 did not count the purported cash in the safe deposit box in 1947, and he testified that "most of [the money in the safe deposit box] was used up already, and before I count the money somewhere in '50 or '51." In other words, it was never actually counted. Petitioner said he used the money to buy mostly Government bonds, and he "bought a lot sometime in '50", yet it is stipulated that his Government bonds only increased about $13,000 during 1950, then stayed the same during all of 1951 and 1952. Petitioner indicates that the $30,000 in the safe deposit box was part of the purported cash hoard left by W. T. Woo. We believe, in view of the evidence mentioned above as to the activities of W. T. Woo prior to his death, that there is no support for such contention by petitioner. There is some testimony by petitioner that during the years 1941 to 1947 petitioner managed to save between $2,000 and $3,000 a year. This is not supported by the returns filed by petitioner, which returns reflect a total taxable income of $6,297 for 1943 through 1947. (No returns were filed in 1941 or 1942). But even *81 if it is so, petitioner's savings during this period, when added to the estate of about $14,000 left by his father in 1941 (and kept intact through 1947) would just about account for the petitioner's total assets ($30,392.29) as of December 31, 1947 as show on the net worth computation. We have also considered the testimony of the witnesses who purportedly saw varying amounts of cash in the safe at various times. The testimony of D. R. Flowers, who has known petitioner and his wife for about 30 years and who has borrowed money from petitioner "[maybe] ten, twelve or more [times]", was that the money he borrowed came from the safe and he saw "a lot of money in there." We don't have any idea from the record exactly when these borrowings took place or when he saw the money. We consider his sketchy testimony very inconclusive and unpersuasive. As for the witnesses W. K. Woo, petitioner's brother, Harry Fong and Paul C. Fong, petitioner's brothers-in-law, and Bing Woo, who came from China to live with petitioner's father in 1937 and stayed with petitioner and his family until 1943, their testimony as to the presence of money in the safe or in the safe deposit box at various times *82 prior to 1948 and as early as 1941, is unconvincing. The bias of these witnesses is apparent. We have studied their testimony with care and conclude that it does not serve to establish the existence of a cash hoard as of December 31, 1947. It would be fruitless to discuss the shortcomings of petitioner's cash hoard story any further. It is permeated by extreme vagueness and inconsistency, and we are convinced of its inherent improbability. See Schwarzkopf v. Commissioner, 246 F. 2d 731; Frank Imburgia, 22 T.C. 1002. We are not bound to accept testimony which clearly appears to be highly improbable or manifestly unreasonable. Frank Imburgia, supra. We think that the bank balance of $8,797.79 and Government bonds of $13,518.75, which are included in petitioner's total assets of $30,392.29 as of December 31, 1947, accurately reflect any accumulations prior to that time. We find that petitioner did not have any cash on hand as of December 31, 1947. It has been stipulated that petitioner and his wife owned equipment and automobiles at the end of each of the years 1951 through 1955 in the respective amounts of $5,826.10, $6,026.10, $6,547.63, *83 $6,547.63 and $7,809.38. It is also stipulated that petitioner and his wife owned "automobiles" at the end of each of the years 1949 and 1950 with a cost basis of $1,826.10. Now petitioner claims that as of December 31, 1947 he had store fixtures with a basis of $4,000 and also owned an automobile with a basis of $850, and he also asserts he purchased a gas heater [3] in 1950 for $300. The revenue agent testified that "[there] wasn't anyone at any time who told me of any specific equipment he might have had back in those years [prior to 1951]." Respondent takes the position that any store equipment owned by petitioner prior to 1951 was fully depreciated, and he states on brief that this is "further supported by the fact that the petitioners did not claim depreciation for any equipment on their income tax returns for the above-mentioned years [1947 through 1950]." Respondent stated at the trial that "we didn't stipulate [petitioner] purchased anything [in 1951]. We merely stipulated that in that year, *84 he had $4,000.00 worth [of fixtures]." Although it is not without misgivings, we feel we can consider the evidence as to the time these fixtures were purchased, even though the stipulation does exist. Petitioner testified that he replaced the cash register in 1946 for about $500, a vegetable cooler in 1946 for $800 and one in 1947 for $400, meat cases in 1947 for $700, and that he bought a gas heater for the store in 1950 for $300. Although we have nothing more than petitioner's uncorroborated testimony as to these purchases, we feel there is some likelihood such fixtures would be replaced in petitioner's store in approximately those years. We find that the fixtures above mentioned were owned by petitioner as of December 31, 1947, with the exception of the gas heater, which we find was purchased in 1950. Petitioner also testified that he bought a 1941 Ford in 1947 for $950 and sold it in 1949 for $850. There is in evidence a list of assets given by petitioner to the revenue agent showing an automobile owned as of December 31, 1947 in the amount of $700. We find that as of December 31, 1947 petitioner owned an automobile in the amount of $700. Necessary adjustments reflecting these *85 acquisitions can be made by the parties in the Rule 50 computation. Petitioner disputes the respondent's estimate of cash living expenses ranging from $4,000 in 1948 to $4,700 in 1955. The net worth computation, in addition, shows living expenses paid by check during the years 1952 through 1955 in the respective amounts of $208.58, $1,182.80, $717.02 and $1,791.94. It is stipulated that these payments by check were for "personal nondeductible living expenses." Respondent estimated that the petitioner spent $1,000 in cash for living expenses each year for each of the four members of his family, and respondent increased this amount $25 each year after 1948 for each member of the family to account for cost of living increases. We believe the respondent's estimate of cash living expenses, especially when added to the stipulated expenditures by check in some of the years, are too high. Petitioner and his family lived frugally. Petitioner and his wife worked long hours at the grocery store so that outside entertainment costs would be minimal. Petitioner's wife testified she made most of her own clothes; that the family was "fortunate" in that it "didn't have many doctor bills"; that *86 they used vegetables from the grocery store that were "a few days old, * * * not exactly spoiled, but you can't sell them, so I used those most of the time"; and that the family ate rice and vegetables almost every meal, and that on the few occasions they prepared meat, they used meat from the store which was a few days old and hard to sell. Petitioners did not have heat in their apartment (over the store) until 1953. Petitioner's testimony as to the living habits of his family was in the same vein as his wife's testimony. We find that the total living expenditures (including expenditures both by check and by cash) of petitioner and his family were $3,000 in each of the years 1948 through 1955. [4]
Likely sources of the petitioner's unreported income computed under the net worth method are evident in the record. See United States v. Massei, 355 U.S. 595. It has been stipulated that during the years 1948 through 1955 petitioner and his wife were engaged in the operation of a retail grocery *87 store and that "[they] received income from this source as well as from rents, interest, sales of property and other sources." It is also stipulated that during the years 1952, 1953 and 1954 there were 24,500, 88,900 and 90,480 pounds, respectively, of sugar purchased in the name of Gambo Woo d/b/a W. T. Woo Grocery from the Young Wholesale Grocery Company and that in 1955 there were 67,280 pounds of sugar purchased from the Smith Grocery Company in the name of Gambo Woo d/b/a W. T. Woo Grocery Company. It appears from the record that customers would come to petitioner's store for the sugar and that he would send his customer, together with petitioner's delivery boy, to the wholesaler to get the sugar. It also appears from the record that among petitioner's frequent customers for sugar were three persons who were known to be engaged in the manufacture of illicit alcohol. A witness testified that persons engaged in such illegal operations would pay a premium (during the years 1953 and 1954) of from $1 to $4 per 100 pounds of sugar over and above the retail price of sugar. On the record as a whole, we think that a likely source of petitioner's unreported income has been convincingly *88 shown. Respondent determined that petitioner was liable for the 50 percent addition to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954 for the years 1948 through 1955. The burden to show fraud is on the respondent and it must be established by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. Petitioner's acquittal in a criminal tax evasion case covering the years 1951 through 1955, while it may be considered, is not a bar to a finding of civil fraud covering the same years. Helvering v. Mitchell, 303 U.S. 391; William G. Lias, 24 T.C. 280, affd. 235 F. 2d 879. The record clearly shows that petitioner omitted interest income from his returns for each of the years 1948 through 1955. It is stipulated that petitioner received interest income in the years 1948 through 1955 on Series G and H Government bonds and on security deeds in the respective amounts of $419.22, $692.39, $1,078.95, $1,227.55, $1,293.56, $1,538.06, $1,469.35 and $1,595.71. In addition, petitioner failed to report interest income received on various *89 bank and savings and loan accounts during these years. In the years 1948 through 1951 the unreported amounts of interest income range from about $80 to about $950, while in each of the years 1952 through 1955 the unreported amounts ranged from about $1,200 to $1,500. Omission of specific amounts of income over a long period of time without a plausible explanation is evidence of fraud. See Schwarzkopf v. Commissioner, supra.We regard petitioner's explanation for his failure to report interest income, i.e., that his accountant (now dead) told petitioner that interest income was not taxable as threadbare and improbable. Moreover, there is evidence in one of the early returns prepared by the accountant that he did include interest in petitioner's income on the tax return and that petitioner prepared a new return, omitting the interest income. Petitioner also argues that some of the unreported interest income belonged to his two children. We cannot understand how petitioner can so argue in face of the stipulation which expressly states that "petitioners received" the various amounts of interest income in the years involved. In a supplemental stipulation it appears, as to *90 interest income received on bank and savings accounts in 1948, 1949 and 1950, that the account "Robert K. Woo or Gambo Woo"earned total interest of about $192, while the account "Dorothy Louise Woo or Gambo Woo" earned interest in 1950 of $161.43. Even if we omit these and similar amounts from the unreported interest income for these years it would have no effect on the overall pattern of underreporting of income. However, we are not at all persuaded that interest earned on such bank accounts, which seem to be joint accounts with the children, cannot be included in the income of the family group. See William G. Lias, supra. Petitioner did not prove very cooperative during the investigation. At first he denied that he ever purchased the large amounts of sugar shown on the records of the wholesalers, and there is other evidence in the record of petitioner's less than complete candor during the investigation. Petitioner went to school through the eighth grade. He impressed us as an intelligent businessman who managed to operate a store over the years, purchase stocks, bonds and security deeds in impressive amounts, acquire security deeds in increasing amounts, and derive *91 income from rents and sales of property. We are convinced that petitioner was well aware of his increasing net worth over the years in question and that he knew that substantial amounts of his income during the years 1948 through 1955 were not reported by him. It has been held that "a taxpayer's consistent and substantial understatement of income over a period of several consecutive years, taken together with other circumstances, can be clear and convincing evidence of fraud." Bender v. Commissioner, 256 F. 2d 771, affirming a Memorandum Opinion of this Court. On the basis of the whole record we hold that a part of the deficiency or underpayment of tax for each of the years 1948 through 1955 was due to fraud within the meaning of section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954. Our discussion above will also serve as the basis for our finding that the returns filed by petitioner for the years 1948 through 1951 and by petitioner and his wife for the years 1952 through 1955 were false or fraudulent returns with intent to evade tax, and hence those years were not barred by the statute *92 of limitations. Section 276(a) of the Internal Revenue Code of 1939 and section 6501(c) of the Internal Revenue Code of 1954. In addition, it is stipulated that the year 1954 is not barred by the statute of limitations because of a timely waiver (Form 872) executed by petitioner and his wife for this year. It also appears that the returns which were filed for 1953 and 1955 were unsigned by petitioner or his wife. An unsigned return filed with the district director does not constitute the filing of an income tax return within the meaning of the statute and does not start the running of the statute of limitations against the respondent. Jesse Ullman Reaves, 31 T.C. 690, aff'd 295 F. 2d 336. Respondent determined additions to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for the years 1948 through 1953 for failure to file declarations of estimated tax for those years. The statute provides for the addition to tax unless the failure to file the declarations of tax is due to reasonable cause and not to wilful neglect. Petitioner admits he did not file the declarations of tax for those years but seeks to excuse himself *93 merely by saying that "I do just what [the accountant] tell me to do." Throughout the entire trial petitioner sought to blame the accountant for the various omissions of income in the returns and failures to file certain returns. We cannot give any credence to such self-serving testimony and we are satisfied that petitioner's failure to file the declarations was not due to any reliance upon the accountant. Nor do we have the slightest indication that the accountant was properly qualified in tax matters so as to have warranted petitioner's purported reliance on his advice. See Rene R. Bouche, 18 T.C. 144. We cannot find on the basis of this record that the failure to file the declarations of tax was due to reasonable cause. We sustain respondent on this issue. Respondent determined additions to tax under section 294(d)(1)(B) of the Internal Revenue Code of 1939 for failure by petitioner to pay installments of estimated tax due for 1954. Respondent also determined additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for 1954 due to petitioner's substantial understatement of estimated tax for that year. No satisfactory evidence was offered at *94 trial to show that petitioner's failure to make the payments of the estimated tax for 1954 was due to reasonable cause within the meaning of the statute. Our discussion above as to the absence of reasonable cause is equally applicable here. As to the issue under section 294(d)(2) of the Internal Revenue Code of 1939 (substantial understatement of the estimated tax), there is no mitigation of the penalty for reasonable cause. Respondent is sustained on these issues. Respondent, by an amendment to his answer, claimed an addition to tax for 1953 under section 291(a) of the Internal Revenue Code of 1939. This statute provides for certain additions to tax in the case of "failure to make and file return * * * within the time prescribed by law * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, * * *." It is stipulated petitioner and his wife submitted unsigned Federal income tax returns for the taxable years 1953 and 1955 to the district director of internal revenue for the district of Georgia. [5] As previously stated an unsigned return does not constitute a return as required by law. Jesse Ullman Reaves, supra.
*95 Petitioner did not testify that his failure to sign the returns for 1953 and 1955 was inadvertent in the sense that he merely forgot to sign the returns before putting them in the mail to the district director. He testified the accountant would turn over the return to him each year with an envelope addressed to the district director and he would mail the return and a check for the tax shown thereon to the district director. It seems to be his testimony that if the accountant told him to sign the return he signed it but if the accountant did not tell him to sign the return he mailed in the unsigned return. His evidence can be summarized by this quotation from his testimony: "Well, he [the accountant] tell me sign it, I sign it. But when he don't tell me, I don't." He signed the returns for six out of the eight years here involved. All of the evidence shows beyond a doubt that petitioner was well aware of his legal obligation to file signed tax returns each year. The puerile excuse that his accountant did not tell him to sign the return, even if true, is not acceptable as reasonable cause for his failure to file a signed return in 1953. We hold for respondent on the issue. Decisions *96 will be entered under Rule 50. Footnotes
1. The record indicates that prior to and for sometime after W. T. Woo's death, there were two safes in the store.↩
2. Petitioner's explanation for this lapse was that "I don't think he ever asked me."↩
3. On brief petitioner states he purchased an air-conditioning unit in 1950 for $300, but the transcript mentions only a gas heater purchased in that year for that amount.↩
4. This amount does not include petitioner's expenditures for life insurance premiums and payments of Federal income tax during these years, all of which have been stipulated.↩
5. Respondent made no claim for addition to tax under section 291(a), I.R.C. of 1939↩, for the year 1955.