R. T. MYERS and EMILY S. MYERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Myers v. Commissioner
Docket No. 873-79.
United States Tax Court
T.C. Memo 1980-262; 1980 Tax Ct. Memo LEXIS 322; 40 T.C.M. (CCH) 698; T.C.M. (RIA) 80262; July 21, 1980, Filed William Norton Baker, for the petitioners. Raymond L. Collins, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency in Federal income taxes and, in the case of R. T. Myers alone, additions to taxes under section 6653(b) [1] as follows: Addition To Tax [2]
Taxable Year
Deficiency
Sec. 6653(b)
1973
0
$2,271.49
1974
$884.81
17,674.47
1975
0
11,105.55
*323 Because of concessions, the only question presented is whether petitioner R. T. Myer's underpayments of his taxes for the years in issue were due to fraud with intent to evade tax. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. At the time they filed their petition herein, petitioners R. T. Myers (hereinafter "petitioner") and his wife, Emily Myers, resided in Lubbock, Tex.
Up until 1976, petitioner was a banker. Between 1955 and 1976 petitioner was employed by the First National Bank of Lubbock (hereinafter "First National"). Prior to 1955, petitioner was a bank examiner for the United States Government. During the years here in issue, petitioner held the position of Senior Vice-President at First National. One of his responsibilities was to meet with and assist Internal Revenue Service agents examining the bank's records in the course of periodic audits. Petitioner reported to First National's President and to its Controller concerning the audits and recommended courses of action regarding proposed adjustments. Petitioner also signed First National's income tax returns. Both to the bank's senior management and to the Revenue agents *324 who worked with him, petitioner appeared competent and knowledgeable about First National's taxes. Another of petitioner's responsibilities was managing First Nationl's bond portfolio, and it was in this capacity that, between 1971 and 1976, he carried out a complex scheme of embezzlement that eventually led to his dismissal in August of 1976. Using First National's credit, petitioner would place an order for a Treasury Bond or a Treasury Bill with a correspondent bank in Dallas or Houston. The amount of the bonds or Treasury Bills purchased ranged from $200,000 to $2 million per transaction. No paperwork would be summitted at First National by petitioner. Generally, the bond or bill would be issued a month after petitioner placed the order. If during the 30-day period between order and issuance the purchase had resulted in a gain, petitioner would put in a sale order with the correspondent bank. On the settlement date, the correspondent bank would debit First National's account for the cost of the bond or bill and credit First National with the proceeds of the sale. The debits and credits relating to the transaction would, of course, be reported to First National on its *325 statement from the correspondent bank. However, since petitioner was charged with sole control of First National's bond portfolio, he usually received the statements from the correspondent banks. When the purchase and sale transaction resulted in a gain, petitioner would issue a debit memo to the correspondent bank for the sale proceeds. He would then personally take the debit memo to a teller at First National and request that a cashier's check be issued to the First Federal Savings and Loan Association for the amount of the profit. The effect of drawing a cashier's check in this manner was to indicate to First National that the entire transaction was carried out for the benefit of the First Federal Savings and Loan Association, a client of First National. Thus, petitioner was able to conceal the transactions from First National's other employees. Upon receipt of the cashier's check payable to the First Federal Savings and Loan Association, petitioner would either hand carry or mail the cashier's check to the First Federal Savings and Loan Association where it would be cashed or deposited into petitioner's personal savings account. From this account, petitioner would eventually *326 transfer the funds into his personal checking account at First National. During the years 1973, 1974, and 1975, petitioner converted to his own use $12,211.25, $76,086.81, and $44,642.04, respectively. Petitioner spent the money for personal purposes in the course of his day-to-day activities. Little if any was saved, but some of the funds were expended on jewelry, art, and antiques. First National uncovered petitioner's scheme in August, 1976, while petitioner was on vacation. Unbeknownst to petitioner, the correspondent banks instituted a new policy of charging customers a $20.00 fee for the type of bank transactions petitioner was carrying out on his own behalf. First National received some charge statements from the correspondent banks for transactions entered into by petitioner but not on the books. Upon investigation, petitioner's scheme was exposed, and he was promptly fired. Petitioner then went to a criminal attorney, who, among other things, told petitioner he had tax problems. As petitioner related at trial: Q: What--did he [the attorney] ask you [petitioner] anything about your--reporting these on your tax return, or what was stated at that time? *327 A [petitioner]: That was one of the primary concerns that he had at that time, as a matter of fact. He asked me if I had reported them on my tax return, and I told him I had not, and that I did not--I was surprised to know that I should because I had no knowledge of that. [Emphasis added.] Petitioner had himself prepared his and his wife's joint tax returns for 1973 through 1975. The returns were detailed, carefully prepared, and demonstrate an above average ability to work through the mechanics of filing an income tax return. With petitioner's help, an accountant prepared amended returns in September 1976 which accurately reflected petitioner's gains from embezzlement. The amended returns were filed May 16, 1977. [3]
Petitioner pled guilty to the felony "Theft, embezzlement, or misapplication by bank officer or employee," 18 U.S.C. sec. 656 (1976), on March 28, 1977. In his statutory notice, respondent made adjustments in petitioners' joint return for 1974, as amended, and asserted the 50 percent fraud penalty for the years 1973 to 1975 with respect only *328 to petitioner. OPINION The only issue presented is whether any part of petitioner's conceded underpayments of his income taxes for the years in controversy was "due to fraud," as that term is used in section 6653(b).
Fraud is an intentional act of wrongdoing with the specific purpose to evade a tax believed to be owing. Mitchell v. commissioner,118 F.2d 308 (5th Cir. 1941). The existence of fraud is a question of fact to be determined from the entire record. Stratton v. Commissioner,54 T.C. 255 (1970). Respondent has the burden of proof and must establish fraud by clear and convincing evidence. Sec. 7454(a); Imburgia v. Commissioner,22 T.C. 1002 (1954). In addition, respondent must show that some part of the underpayment of tax was due to fraud for each taxable year in issue. Otsuki v. Commissioner,53 T.C. 96 (1969). The parties are agreed that petitioner substantially understated his income on his returns for each year in issue when he failed to report funds he had misappropriated from his employer. Petitioner claims that he did not realize that embezzled gains were taxable income until after he had *329 discussed his situation with counsel. Therefore, petitioner argues, at the time he filed his returns he did not intentionally understate his income. Petitioner points out that whether he should have known such gains were taxable is not conclusive on the issue of what he, in fact, did know. Respondent argues that petitioner mst have known that embezzled income wax reportable, and concludes that since petitioner knowingly omitted income, his returns for the years in controversy were fraudulent. Based upon our consideration of the entire record, we agree with respondent for the reasons below. The parties have narrowly framed the issue in this case. An essential element of respondent's case is that petitioner believed he owed and was evading taxes on unreported income at the time he filed his returns. Mitchell v. Commissioner,supra; McGee v. Commissioner,61 T.C. 249, 256-257 and cases cited (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). Obviously, we cannot now look inside petitioner's mind, much less divine precisely what his thoughts might have been in the past. But direct evidence of fraudulent *330 intent is seldom available, thus it is well settled that respondent's burden of proof may be met with circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); Gano v. Commissioner,19 B.T.A. 518 (1930). Such evidence includes conduct calculated to mislead or conceal. Acker v. Commissioner,26 T.C. 107 (1956). Taken as a whole, we think the evidence is clear and convincing that petitioner believed he owed taxes on the income from embezzlement which he failed to report on his returns. On brief, petitioner refers to the unsettled state of the law pertaining to the taxation of embezzlers, as it existed prior to the Supreme Court's decision in James v. United States,366 U.S. 213 (1961). However, we do not think petitioner can now rely upon whatever confusion may once have existed. James held that embezzled gains constituted taxable income. The rationale of James was that the language of § 61(a) of the 1954 Code, "all income from whatever source derived," has been held to encompass all "accessions to wealth, clearly realized, *331 and over which the taxpayers have complete dominion." [366 U.S. at 219, quoting Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955).] In essence, James held that gains from embezzlement are like other illegal income and are taxable because the embezzler, like the ordinary wage-earner, intends to keep for himself the money he realizes by his efforts. [4] See also Eisner v. Macomber,252 U.S. 189 (1920) (Holmes, J., dissenting). Petitioner certainly knew that what he was stealing from First National was income to him; he spent the money paying his everyday expenses. As a bank officer, petitioner realized that income, in general, is taxable. The exceptions that do exist, such as interest on municipal bonds or workmen's compensation, are few and are narrowly defined by statute. It asks too much of the Court for us to believe that petitioner had no idea his embezzlement income was taxable. *332 Moreover, petitioner argues persuasively that although he possessed some expertise in the specialized field of bank taxation, he had only a layman's generalized knowledge of individual taxation. The conclusion to be drawn is that petitioner was completely unfamiliar with the theoretical legal problems addressed in James. The ordinary layman's understanding of our tax laws is based on the "Instructions for preparing Form 1040." These instructions clearly state that "Embezzled or other illegal income" must be reported. Petitioner testified that he was "surprised" to learn that the fruits of his embezzlements constituted taxable income. However, if petitioner had not been embezzling the proceeds, the gains from his sales of Treasury Bonds would have been taxable income to First National. As the bank officer in charge of filing First National's returns and dealing with the Internal Revenue Service, petitioner was well aware that he was not just stealing deposits, he was stealing income. Had petitioner bought bonds on his own credit and then sold them for short-term gain, he clearly would have had taxable income. Yet, petitioner would have us believe that he never considered *333 whether the embezzled proceeds were income to him. The gravamen of tax fraud is willful concealment. Spies v. United States,supra. In this case not only did petitioner fail to report his embezzlement income until after being caught, it is obvious that petitioner was using his position and his knowledge of banking taxation to conceal his embezzlements from both First National and from the Internal Revenue Service agents auditing the bank. In short, petitioner's "surprise" upon learning from counsel that embezzlement income tax taxable must have been mild indeed, and, despite petitioner's general forthrightness at trial, that part of his testimony cannot be taken at face value. We hold respondent has clearly and convincingly proven fraud with intent to evade taxes for each year in issue. Accordingly, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. The amounts of what otherwise would have been deficiencies for 1973 to 1975 were reduced when petitioner filed amended returns for those years on May 16, 1977. But such amended returns do not reduce the "underpayment," as defined in sec. 6653(c), upon which the penalty for fraud is computed. See Papa v. Commissioner,464 F.2d 150↩ (2d Cir. 1972).
3. Amended returns for 1971 and 1972 were also filed. They are not here in issue.↩
4. See Estate of Spruance v. Commissioner,43 B.T.A. 221, 225 (1941), revd. sub nom. McKnight v. Commissioner,127 F.2d 572 (5th Cir. 1942). Estate of Spruance was followed in Wilcox v. Commissioner,3 TCM 881 (1944), revd. 148 F.2d 933 (9th Cir. 1945), affd. 327 U.S. 404 (1946). The Supreme Court's holding in Wilcox was overruled in James v. United States,366 U.S. 213 (1961) (adopting the reasoning of Estate of Spruance↩).